OPINION OF THE COURT
Jasen, J.
The issues raised on this appeal concern the power of the Attorney-General to investigate the allegedly illegal sale and distribution of tickets to events held at a large sports arena (arena).[1] More specifically, we are asked to decide whether the Attorney-General is statutorily authorized to conduct such an investigation and to issue subpoenas pursuant thereto. We are also called upon to decide whether the respondent-attorney was properly disqualified from representing any of the individual respondents-employees in connection with the subject investigation.
Pursuant to article 26-A of the General Business Law, the Attorney-General commenced an investigation into allegedly unlawful practices of arena box office personnel. The thrust of the investigation appears to be focused upon the manner in which tickets to certain rock concerts and a hit stage production were distributed.
In connection with the concerts, the arena announced that tickets would be available to fill mail order requests postmarked on or after October 1, 1980. However, due to the enormous volume of ticket requests, the arena’s box office allegedly honored only those requests postmarked October 1, 1980. Even then, only a fraction of those requests could be filled. Records of the names and addresses of persons who received tickets were kept by the box office.
The Attorney-General alleges that many of the names and addresses of ticket recipients listed in the box office records are of nonexistent people or people who never requested or received tickets to the concerts. It is further alleged that several of the money orders cashed by the arena as proceeds of the ticket sale were purchased weeks after the October 1 deadline. As a result, the Attorney-General proceeded to gather additional evidence which he *189 claims reveals that certain of the arena’s box office employees personally received “ice” (money in excess of regular ticket prices) from ticket brokers in return for accepting their falsely completed money orders and furnishing them with quantities of tickets which these brokers later “scalped” (sold for a price in excess of the allowable surcharge above the face value of the ticket), all in violation of sections 399-n, 399-Z and 169-k of the General Business Law. The money orders allegedly provided by the brokers to the ticket vendors contained names and addresses of fictitious people or people who neither requested nor received tickets.
Furthermore, it is alleged by the Attorney-General that additional evidence indicates that members of the arena’s box office staff provided large quantities of Ticketron tickets to a successful stage production to ticket brokers in return for the payment of “ice”.
In furtherance of his efforts to identify the individual members of the arena staff responsible for these illegal activities, the Attorney-General subpoenaed 14 box office employees (respondents herein) to appear and testify at an inquiry concerning ticket distribution practices preceding the afore-mentioned events. All 14 witnesses are now represented by respondent-attorney and were so at the time they appeared before the Attorney-General.
When called, seven of the witnesses invoked their Fifth Amendment privilege. Five of those seven were excused subject to recall and the other two were subsequently granted immunity pursuant to section 399-i of the General Business Law and testified. Their testimony, however, failed to inculpate any arena employees. Because the Attorney-General believes that the substance of their testimony is contradicted by other evidence, he is expanding his investigation for possible development of perjury cases against both witnesses. The remaining seven witnesses appeared at the Attorney-General’s office, but were excused subject to recall pending the outcome of the Attorney-General’s application to disqualify their attorney from continuing in his multiple representation. The latter seven witnesses were not questioned, did not invoke their Fifth Amendment privilege and were not offered immunity.
*190 The Attorney-General’s application to disqualify was brought in Criminal Term of the New York County Supreme Court by order to show cause dated November 17, 1981. Respondents opposed the application and requested that the Attorney-General’s subpoenas be quashed pending a showing by the Attorney-General that he was authorized to issue them. Supreme Court granted the Attorney-General’s application to disqualify and denied respondents’ motion to quash. On appeal by respondents to the Appellate Division, the Attorney-General argued for dismissal of the appeal as brought without statutory authority. The Appellate Division refused to dismiss the appeal but, nevertheless, affirmed the order of Supreme Court. This court granted respondents’ motion for leave to appeal (59 NY2d 603).
At the outset, we reject the Attorney-General’s claim that the order of Supreme Court is not appealable to either the Appellate Division or this court. His argument is premised on the rule that direct appellate review of orders issued in a criminal proceeding is not available absent statutory authority therefor. (See Matter of Santangello v People, 38 NY2d 536, 538; Matter of Alphonso C. [Morgenthau], 38 NY2d 923, 924-925.) The flaw in the Attorney-General’s position is that the instant proceedings cannot be properly characterized as criminal in nature.
*191 Certainly, the jurisdiction of this court or the Appellate Divisions cannot be defined by the fortuitous assignment of a matter in dispute to one part of Supreme Court rather than another, as the dissent suggests. That such is not the law in this State is aptly demonstrated by this court’s decision in Matter of Cunningham v Nadjari (supra), where we held that a proceeding involving a motion to quash subpoenas in a criminal investigation was civil by nature even though the matter was heard in an Extraordinary Term of Supreme Court which was created by the Governor solely to facilitate ongoing criminal investigations. What was dispositive in that case was the fact that the order to quash was issued by a term of Supreme Court which possesses both criminal and civil jurisdiction. Thus, the statement in the dissent that it is beside the point that Supreme Court also possesses civil jurisdiction is incorrect.
In cases with procedural postures similar to the one before us, rather than simply looking to the part of Supreme Court where the motion was originally heard, we have looked to the true nature of the proceeding and to the relief sought in order to determine whether the proceeding was criminal or civil. In Matter of Santangello v People (supra), the petitioner sought to compel the Special State Prosecutor to inquire of Federal authorities as to whether they had conducted electronic surveillance of him and also requested the prosecutor to state whether any of the questions asked of him before the Grand Jury were the product of such surveillance. Recognizing that the relief sought was part and parcel of the ongoing criminal investigation and that the proceeding was clearly criminal in nature, this court dismissed the appeal to our court and remitted to the Appellate Division to dismiss the appeal taken to that court as lacking statutory authority therefor. Similarly, proceedings whereby the petitioners-District Attorneys requested the court to order the respondents to appear in a lineup and to provide handwriting exemplars were characterized as criminal and the appeals from the orders of nisi prius were dismissed in light of the fact that the proceedings were criminal in nature and the relief requested, if granted, would have become an integral part of the criminal investigation. (Matter of Alphonso C. [Morgenthau], 38 NY2d 923, supra.)
*192 By sharp contrast, this court has held that the denial of an application to quash subpoenas issued in furtherance of a criminal investigation into drug abuse on the SUNY at Stony Brook campus was a final and appealable order in a special proceeding on the civil side of a court vested with civil jurisdiction. (Matter of Boikess v Aspland, 24 NY2d 136; see, also, Matter of Cunningham v Nadjari, supra, at p 317.) Implicit in Boikess and Cunningham is this court’s view that a motion to quash subpoenas, even those issued pursuant to a criminal investigation, is civil by nature and not subject to the rule restricting direct appellate review of orders in criminal proceedings.
It should be clear, therefore, that insofar as the subject proceedings concern the denial of respondents’ motion to quash the Attorney-General’s subpoenas, the order appealed from is final and appealable. (Matter of Cunningham v Nadjari, supra; Matter of Boikess v Aspland, supra.)
We reach the same conclusion after analyzing the motion to disqualify respondent-attorney. At the outset, we note that the dissenters’ reliance on Flanagan v United States (465 US_, 104 S Ct 1051), Matter of Kavanagh v Vogt (58 NY2d 678, affg 88 AD2d 1049) and Matter of Schumer v Holtzman (60 NY2d 46) for the proposition that the subject proceeding is criminal is clearly misplaced. In Flanagan, four police officers were arrested and charged by a Federal Grand Jury in a 13-count indictment with allegedly conspiring to make illegal arrests and arresting and abusing eight people. The District Court, pursuant to rule 44 (c) of the Federal Rules of Criminal Procedure (in US Code, tit 18, Appendix), disqualified the criminal defendants’ attorney. The United States Court of Appeals affirmed and the United States Supreme Court dismissed the appeal, holding that the order was not appealable under section 1291 of title 28 of the United States Code. Not only do the facts of that case differ markedly from those in the appeal now before us, but the Federal statutes and case law applied by the Supreme Court in reaching its decision are inapposite to the consideration of our own State appellate jurisdictional limits. Moreover, there is no analysis in Flanagan (and because of the different facts of that case there may have been no need for any) of the question whether the *193 proceeding was civil or criminal in nature. Nor do this court’s decisions in Matter of Kavanagh v Vogt (supra) or Matter of Schumer u Holtzman (supra) support the dissenters’ position, for the jurisdictional question presented here was not even an issue in those cases. In Matter of Kavanagh v Vogt (58 NY2d 678, affg 88 AD2d 1049, supra), we held that the extraordinary remedy of prohibition does not lie to review a County Court’s action in disqualifying an attorney. The questions whether the proceeding was criminal or civil or whether appellate review of disqualification orders is permitted were never raised, considered or addressed in that case. These questions were similarly absent in Matter of Schumer v Holtzman (60 NY2d 46, supra), where we held only that because no actual prejudice or a substantial risk thereof was demonstrated by the objector “the conditions petitioner raises do not come within that narrow area in which a court may consider whether counsel should be removed from a particular case.” (Id., at p 55.) Original review, not appellate review, of disqualification requests was at issue in Matter of Schumer. The question of what distinguishes a civil from a criminal proceeding had no relevance to that case whatsoever and was, therefore, never raised by the parties nor considered by this court. Thus, it is difficult to see how the dissenters can rely on those decisions as support for the proposition that this proceeding commenced by the Attorney-General to disqualify counsel is a criminal proceeding.
Employing the mode of analysis which this court has consistently adhered to in deciding whether a proceeding is criminal or civil, we look to the nature of the proceeding and the relief sought. In doing so, we recognize that at some time in the future the Attorney-General may file criminal charges against certain members of the arena’s box office staff and thereby arguably commence a criminal proceeding. However, to date the only aspect of the subject proceeding that is criminal in nature is the Attorney-General’s investigation, and even that may only result in the imposition of civil penalties or in no criminal charges or civil complaints being filed at all. Furthermore, there have been no criminal charges filed and no arrests made in this case and criminal prosecution has not even been threat *194 ened with respect to particular respondents. Additionally, there has been no Grand Jury empaneled. (Compare Flanagan v United States, supra.)
All that is involved in the subject proceeding, apart from the motion to quash, is a motion to disqualify respondent-attorney. Unlike the petitioner’s request in Matter of Santangello v People (38 NY2d 536, supra) to compel the Special State Prosecutor to make inquiries of Federal law enforcement authorities concerning electronic surveillance and to require the prosecutor to reveal the source of questions asked of him before a Grand Jury, the subject proceeding involves a motion to disqualify based upon an alleged conflict of interest which would be treated the same whether it arose in the context of a purely civil lawsuit or, as it did here, in the context of a criminal investigation. The proceeding at issue here is likewise distinguishable from a proceeding to compel an individual to appear in a lineup and to provide handwriting exemplars as was the case in Matter of Alphonso C. (Morgenthau) (38 NY2d 923, supra).
We believe that the request to disqualify an attorney is more akin to a motion to quash subpoenas. (See Matter of Boikess v Aspland, supra; Matter of Cunningham v Nadjari, supra.) As to both such requests, the relief sought has nothing inherently to do with criminal substantive or procedural law and either type of motion may arise as easily in the context of a purely civil lawsuit as in a purely criminal case. We hold, therefore, that in the posture in which the subject proceeding arose, the motion to disqualify was, and is, predominantly civil by nature and the proceeding in which it was brought must be deemed civil as well. As a result, this appeal may be entertained.
Turning then to the merits of this appeal, we first address respondents’ claim that the Attorney-General lacks jurisdiction to conduct the criminal investigation and hold that this position is untenable. Subdivision 4 of section 399-n of the General Business Law[2] makes it illegal for any person to sell tickets to theatrical productions until *195 the person controlling the distribution of said tickets files a “ticket distributor registration” containing the names of all personnel connected with the ticket distribution. The statute further provides that a person who accepts a premium in excess of the established price of the ticket, plus lawful taxes, from ticket brokers or others may be canceled or suspended from eligibility as a ticket vendor under the registration. It is illegal for any person not named in the registration or whose eligibility has been canceled or suspended to participate in the distribution of tickets. Section 399-l provides that any person violating any of the provisions of article 26-A shall be guilty of a misdemeanor. It is clear, therefore, that contrary to the respondents’ contentions, the thrust of article 26-A is not purely civil. Thus, there is no bar to the Attorney-General undertaking a criminal investigation pursuant thereto. Indeed, it appears that the Attorney-General’s investigation in this case is aimed at conduct which has been specifically made criminal under article 26-A, as well as section 169-k of article 10-B of the General Business Law.[3]
Moreover, article 26-A gives the Attorney-General broad power to investigate suspected violations of this article (General Business Law, § 399-d), to subpoena witnesses to appear and testify before him (General Business Law, § 399-d, subd 2) and to confer immunity upon witnesses (General Business Law, § 399-i). At the conclusion of his investigation, the Attorney-General is authorized to “prosecute every person charged with a criminal offense in violation of this article and regulations issued thereunder.” (General Business Law, § 399-j.)
In light of this broad grant of power to pursue criminal investigations under article 26-A, including specifically the right to subpoena witnesses to appear before him, and the direction to construe this article liberally to effect the purposes thereof (General Business Law, § 399-o), we hold *196 that the Attorney-General has not acted without jurisdiction by issuing the subject subpoenas in furtherance of this criminal investigation. Thus, the respondents’ motion to quash the subpoenas was properly denied by both courts below.
The more troublesome issue which we now address is whether, under the facts of this case, it was proper to disqualify the respondent-attorney from continuing to represent the 14 respondents-employees. We hold that it was not.
We begin our consideration of this issue, which has not been previously addressed by this court, by recognizing that although an individual possesses no absolute right to representation by an attorney of his choice (Greene v Greene, 47 NY2d 447, 452;[4] People v Hall, 46 NY2d 873, cert den 444 US 848; United States v Hobson, 672 F2d 825, and cases cited in footnote, at p 829, cert den 459 US 906; United States v Cunningham, 672 F2d 1064, 1071; United States v Armedo-Sarmiento, 524 F2d 591, 592; United States v Sexton, 473 F2d 512, 514), any restriction imposed on that right will be carefully scrutinized. (United States v Hobson, supra; People v Doe, 98 Misc 2d 805.) An individual’s right to select an attorney who he believes is most capable of providing competent representation implicates both the First Amendment guarantees of freedom of association (N. A.A.C.P. v Button, 371 US 415; NY Const, art I, § 9) and the Sixth Amendment right to counsel (cf. Faretta v California, 422 US 806; NY Const, art I, § 6) and will not yield unless confronted with some overriding competing public interest (Matter of Kelly, 23 NY2d 368, 378, n 3; People v Doe, supra; Matter of Gopman, 531 F2d 262, 268).
The Attorney-General argues that the public has an overriding interest in ensuring the swift and effective investigation of criminal activity which must prevail over the right of suspects to be represented by an attorney of *197 their choice whenever that attorney’s advice to his multiple clients hampers an ongoing investigation. In such cases, the Attorney-General contends, the court is duty-bound to disqualify the attorney. Respondents, however, claim that their right to select a particular attorney is too precious to be disregarded merely because the subject multiple representation has prevented the Attorney-General from being able to obtain testimony from them without first providing immunity. Although not pressed by either side, we take note of two additional considerations tangentially related to this dispute — the right of an individual to the effective assistance of counsel which may be impaired if an attorney’s loyalty to that individual is adversely affected by a conflict of interest existing as a result of the attorney’s representation of multiple clients (see People v Gomberg, 38 NY2d 307, 313) and the courts’ duty to protect the integrity of the judicial system and preserve the ethical standards of the legal profession (see United States v Dolan, 570 F2d 1177, 1184; see, also, Code of Professional Responsibility, Canon 5, DR 5-101, EC 5-14, 5-15; Canon 9; see, generally, Canon 4). Because we believe that existing safeguards are adequate to protect an individual’s right to effective assistance of counsel, the integrity of the legal system, and to ensure that criminal investigations will be conducted effectively, we decline, in the absence of a showing that some overriding public interest is threatened, to lend the weight of the courts to the Attorney-General’s investigative efforts in this case by disqualifying the respondent-attorney.[5]
Turning first to the interest of the public in having suspected criminal activity investigated quickly and effectively, we note that there are a number of tools available to the prosecution which can be used to ensure that an investigation will not be unduly hindered. The crux of the Attorney-General’s complaint in this case is that his efforts directed at imposing criminal responsibility upon individual targets are being frustrated by the respondents-employees’ refusal, upon their attorney’s advice, to testify without immunity. Assuming this to be so, we are in no *198 way persuaded that the instant situation calls for the relief which the Attorney-General seeks. All that the employees have done so far in this case (and only seven of them at that) is assert their Fifth Amendment right to remain silent. The fact that respondent-attorney may have advised his clients to do so, coupled with the Attorney-General’s frustration at not being able to compel the testimony of the individual respondents without providing them with immunity, does not indicate that the respondent-attorney has to date committed any legal or ethical impropriety. Accordingly, nothing has happened in this case which requires that the attorney be disqualified.
Furthermore, in light of the Attorney-General’s failure to use the investigative procedures available to him, it is difficult to see how his investigation has been, in his words, “stonewalled”. Of the 14 witnesses called to appear, seven never asserted their privilege against self incrimination; and of the seven who did, only two were granted immunity. Moreover, those two testified fully by answering all questions put to them. Thus, the Attorney-General has many investigative avenues still open to him. He can summon and question the seven employees who did not assert their right to remain silent and, as to the witnesses who assert or have asserted their Fifth Amendment privilege, their testimony can be elicited simply by granting them immunity pursuant to section 399-i of the General Business Law. Indeed, the power to grant immunity is precisely the tool which was designed by our Legislature to serve as an accommodation between the individual’s right to remain silent and the government’s interest in compelling testimony necessary to uncover criminal wrongdoing. With these tools yet untried, the Attorney-General’s claim that his investigation has ground to a halt is untenable.
Additionally, even if those tools were to prove fruitless, there are other means of dealing with uncooperative witnesses and their attorney. If a witness who is offered immunity nevertheless decides to remain silent, he may be prosecuted for contempt or, if he decides to testify but does so falsely, he can be charged with perjury. If the witnesses take either of these actions upon their attorney’s advice, the attorney may also face criminal liability. Additionally, *199 the attorney may face disciplinary action if he refuses to withdraw from representing multiple clients where his ability to act for one is adversely affected by his representation of others. (Matter of Kelly, 23 NY2d 368, 375, supra; see, also, Code of Professional Responsibility, DR 5-101.) We hold, therefore, that, except in an exceptional case, the Attorney-General must make full use of the investigatory and prosecutorial procedures available to him before asking the courts to take the extraordinary measure of disqualifying an individual’s chosen attorney. We further hold that disqualification of an attorney representing multiple witnesses in the same matter may never be ordered if it is found that the sole reason for the request is to allow the prosecutor or the investigator to pit the witnesses against each other so that the maximum amount of testimony can be obtained while granting the least amount of immunity. An individual’s right to an attorney of his choice is too important to be disregarded simply because the prosecutor’s or the investigator’s task may be made easier if he is allowed to divide and conquer his perceived opposition. As a result, the instant application to disqualify is patently premature.
Turning next to the courts’ interest in protecting an individual’s right to effective assistance of counsel, we note that some courts take a highly paternalistic approach and disqualify attorneys from representing multiple clients whenever a potential conflict of interest arises even though the clients may have expressly waived their right to conflict-free representation. (United States v Dolan, 570 F2d 1177, supra; Matter of Gopman, 531 F2d 262, supra; Matter of Grand Jury Proceedings, 428 F Supp 273.) In at least one decision, a similarly paternalistic approach was justified largely on the court’s duty to protect the integrity of the judicial system and to enforce the ethical standards of the bar. (United States v Flanagan, 679 F2d 1072, revd on other grounds 465 US_, 104 S Ct 1051, supra.) While we believe the concerns of those courts are laudable, we do not think it necessary to interfere with an individual’s choice of counsel before a criminal proceeding has been commenced in order to protect either that individual’s right to effective assistance of counsel or the integrity of our judi *200 cial system. Other existing safeguards are adequate for those tasks.
In this case, the Attorney-General has not filed charges against the respondents-employees, no arrests have been made and criminal prosecution has not in any way been threatened. In short, the employees have not been placed in jeopardy and, indeed, may never be. Thus, we perceive no need at this point in time to require the courts to take measures designed to ensure that the employees are provided with meaningful representation — i.e., that they are aware of the potential or actual conflict of interest and the attendant risks and have knowingly and intelligently waived their right to conflict-free representation. This is not to say, however, that if a criminal proceeding is eventually commenced against the respondents, the courts may blindly permit them to proceed to trial without inquiring as to whether they recognize and appreciate the risks of multiple representation. To the contrary, at the time respondents appear for trial, the court is required to make such an inquiry and satisfy itself that they have knowingly waived their right to separate counsel. (People v Macerola, 47 NY2d 257; People v Gomberg, 38 NY2d 307, supra.) Until charged with a crime, however, the respondents are free, absent extraordinary circumstances, to employ the attorney or attorneys of their choice without interference by the courts.
Applying the afore-mentioned principles to the facts of this case, it becomes at once clear, upon the record before us, that disqualification of respondent-attorney was inappropriate. The Attorney-General failed to show that his investigation has in fact been unduly hindered and has refused to utilize existing tools (questioning witnesses, granting immunity, or prosecuting for contempt, perjury, or subornation of perjury) in his investigatory efforts. Thus, the public’s interest in an effective investigation of suspected criminal activity has not been threatened by the respondent-attorney’s representation of multiple clients in this case and the Attorney-General’s application to disqualify is, therefore, premature. Furthermore, the Attorney-General has not demonstrated the existence of any *201 overriding public interest sufficient to warrant judicial interference with an individual’s right to select an attorney of his choice.
Accordingly, the order of the Appellate Division should be modified by reversing so much thereof as disqualified respondent-attorney from representing the respondents-employees, and, as so modified, affirmed.

. Supreme Court ordered the record in this case sealed in order to maintain the confidentiality of the investigation and protect the identity and reputations of the box office personnel. We continue to maintain the confidentiality of the parties involved.

. Section 399-n and other relevant provisions of the General Business Law have been repealed effective December 31, 1983. The subject matter contained in those provisions is now covered by the Arts and Cultural Affairs Law.

. Also without merit is respondents’ claim that the subject rock concerts are not “theatrical productions” as that term is used in subdivision 4 of section 399-n and defined in subdivision 2 of section 399-n. Construing the term “theatrical production” liberally, as we must in accordance with section 399-0, it seems clear that the subject concerts should be classified as “dramatic-musical productions which hereafter are shown to the public in a theatre run for profit.” (General Business Law, § 399-n, subd 2.) As such, article 26-A is applicable to those concerts as well as to the stage production.

. We recognize the differing constitutional implications of restricting an individual’s right to counsel of his choice in the civil as opposed to the criminal context. However, inasmuch as similar policy considerations are often involved in both situations, we will at times throughout this opinion rely on the reasoning of a small number of civil cases. Similarly, although most existing case law deals with Grand Jury, rather than Attorney-General, investigations, the policy considerations applicable to each are so similar that examination of decisions discussing Grand Jury investigations is instructive.

. Because we hold that the Attorney-General’s application for disqualification is patently premature, we need not and do not decide in what situations, if any, disqualification of an individual’s attorney might be an appropriate remedy.