OPINION OF THE COURT
Phylis Skloot Bamberger, J.
*666 This court ordered a mistrial on January 4, 2005 after the People’s opening statement. This opinion sets out the findings and conclusions supporting the mistrial and the reasons it was manifestly necessary.
The defendant was charged on August 30, 2003 with falsely reporting an incident in the third degree, an A misdemeanor. Defense counsel filed a notice of appearance on October 16, 2003. In the criminal court, the case was before at least four judges for various pretrial motions made by counsel. On January 3, 2005, after the merger of the Supreme Court, Criminal Term, and the Criminal Court in Bronx County, the case was sent to this court for trial. On January 3, 2005, a jury of six with two alternates was selected and the prosecutor made his opening statement.
A. Defense Counsel’s Conflict of Interests is Revealed.
The prosecutor’s theory of the case as announced in his opening statement was that the defendant did not give false information to the police directly, but that she caused false information to be given to the police by her erstwhile boyfriend. The circumstances described by the prosecutor were that she told her boyfriend that she would injure herself if he did not visit her. When the boyfriend did not appear, the defendant telephoned him to say she had injured herself. The boyfriend then called 911. The central dispatcher sent out the call over the police radio and officers responded to the defendant’s home. When they arrived at the location, they saw a scalpel and blood on the floor but the defendant was not found. A massive search was begun involving the canine, aviation, and marine units of the police department. The defendant was found several hours later hiding in a closet in her home with no injuries.
Triggered by a disparity between the prosecutor’s opening statement and the prosecutor’s witness list that included only police officers who had no personal knowledge about the alleged telephone calls, the court asked the prosecutor how he planned to prove that the defendant called her boyfriend, what the defendant said in the call, that a telephone call was made to 911 by the boyfriend, and the contents of the call to 911. The explanation of the evidence led to a discussion of other critical issues and the arguments extended over two days on January 3 and 4. To enable the discussions to proceed, the jury was excused early on the first day and on the second day the jurors remained in the jury room for part of the morning session and were then excused until after the lunch hour.
*667 At the conclusion of the extended discussions, the court ruled that the People’s offer of proof relied on inadmissible hearsay and that someone with personal knowledge of the alleged telephone call by the boyfriend was needed to prevent a violation of the defendant’s confrontation rights.*
As a consequence of the ruling, the prosecutor stated that he would call the boyfriend as a witness and on the morning of January 4, 2005, the court signed a subpoena for the appearance of the boyfriend to testify later on that day. (Transcript at 43.) When the court issued the subpoena and it appeared likely that the boyfriend would be called as a witness for the People, defense counsel said:
“It also raises another question . . .
“In the past, I could represent that I represent [the boyfriend] on other matters.” (Transcript at 45.)
The following colloquy took place:
“the court: You will have to drop out of the case.
“defense counsel: I may. I’d have to hear an offer of proof of what he is going to say, if it is different than what my understanding is. Then that will be a severe problem. I know this is the first time his name was mentioned, he wasn’t on the witness list when the people opened. So . . .
“the prosecutor: Your Honor, given that representation, I think that a huge problem arises. There are, just speaking with the officer this morning, Officer Johnson Demore, she alluded to conversations she had with . . . [the boyfriend] in the past which may be the center of any representation that . . . [defense counsel] has represented . . . [the boyfriend] in. If that’s the case, then I believe there is going to be a conflict here.” (Transcript at 45-46.)
B. The Discussion of the Conflict is Diverted.
Defense counsel ignored the conflict issue when it arose and asked to continue a previously begun discussion of the destruction of the tape of the boyfriend’s call to 911. (Transcript at 46-48.) Then the prosecutor returned to the issue:
“the prosecutor: There is also now the prevailing *668 issue as to any conflict that may arise between [defense counsel] and [the boyfriend].
“the court: You were actually his counsel as opposed to interviewing him as a potential witness or non-witness in this case?
“defense counsel: Yes.
“the court: Are you free to indicate the nature of the proceeding?
“defense counsel: You’re asking me to violate attorney-client confidentiality?
“the court: No.
“defense counsel: If you order me to do that I will but, otherwise, I have nothing to say other than I represented him in the past.
“the court: Okay. But you were his lawyer?
“defense counsel: Yes, Ma’am, that is what I indicated.” (Transcript at 48-49.)
Defense counsel then returned to what he called the “original motion,” which challenged the validity of the accusatory instrument and he made a motion to dismiss on the People’s failure to state a prima facie case in the opening. He also argued that the prosecutor had acted deceptively when he did not inform the defense of a statement made by the defendant when she was arrested and, based on that omission, counsel argued he was sandbagged. An extensive colloquy followed. (Transcript at 50-76.)
After the colloquy on the other issues, defense counsel said
“We have the problem with [the boyfriend].
“the court: Yes, we do. We also have an issue of eight jurors sitting upstairs since 10 o’clock this morning and not having been told anything.
“defense counsel: I would have raised this issue earlier if I knew I would have to call him as a witness. For the district attorney to do this after the case has started and after he’s opened, I believe, is causing a deliberate mistrial. For whatever reason, he is trying to do that.” (Transcript at 76.)
The court asked the prosecutor to explain efforts to reach the boyfriend. (Transcript at 80-83.)
The prosecutor explained that he had sent letters but that he did not know if the boyfriend ever got them. He stated that he had spoken to the boyfriend early that morning:
“the prosecutor: I expected him to reject our *669 claims, as he put forth this morning. That he would not come in to testify voluntarily, that he would not come in to testify for the People. In fact, he would not come in and testify against the defendant. Those are the statements he made to me this morning.
“the court: That is certainly not — and what would he do to avoid testifying, did he say?
“the prosecutor: He did not say, your Honor. And I explained to him that the procedures that could be taken. He said, well, no matter what he doesn’t want to come in and hurt [the defendant]. Although he may not be with her, he still cares for her and would not be testifying against her.” (Transcript at 83.)
Defense counsel then stated:
“Had they interviewed [the boyfriend] over the course of — this is August of 2003. And we are sitting here January of 2005, had they contacted him and interviewed him, and discussed his background with him, as you would do with any witness that you’re preparing for trial, they would find out that there are certain problems that he has, and in further inquiry they would find out that I was his attorney on those cases, and none of this would be a problem. They didn’t do that. They have deliberately misled me on the affirmation saying there was a statement, knowing full well there were statements made to the cops.” (Transcript at 85-86.)
Claiming prosecutorial misconduct defense counsel asked for a mistrial and dismissal of the charges. (Transcript at 86.)
The jury was discharged until after lunch. After a brief recess, the prosecutor informed the court that the boyfriend was cooperating and would be in court shortly. (Transcript at 89.) The court explained that the conflict must have been apparent to defense counsel before the trial began because he had represented the boyfriend and the boyfriend’s conduct was a key element in the commission of the crime, whether or not he was to be called to testify. (Transcript at 90.) The court found that there was no bad faith by the People with the intent to cause a mistrial; rather there was a lack of recognition of the seriousness of the issues.
Defense counsel again raised the claim that the complaint was invalid, and concluded: “[W]e’re wasting time. Let’s get out of here. You have obviously made it clear that I can’t represent my client any more. So let’s not waste anybody’s time anymore, Okay?” (Transcript at 93.)
*670 Counsel was asked to remain present until the boyfriend arrived in court so that he could be admonished in his presence and in the presence of the defendant. (Transcript at 43.) The court also set parameters for the defendant’s contact with the boyfriend so as to avoid any intimidation. (Transcript at 94.) Counsel stated that he understood that the information learned from the boyfriend in the course of the representation could not be used to help the defendant. (Transcript at 98.)
The defendant was given the Gomberg notice. (Transcript at 98-99.) The court said that the case would go back to the “upfront” judge who had the case prior to the trial and that judge would also explain to the defendant her right to conflict-free counsel. The court told the defendant that the other judge might require that she have a different attorney. (Transcript at 99-100.)
The defense counsel stated “clearly, I’m not going to be the attorney” (transcript at 102), the defendant is “not my client anymore . . . you’ve taken care of that one.” (Transcript at 103.)
At that moment, the boyfriend arrived in court. Defense counsel immediately left the courtroom (transcript at 103), and did not return. The boyfriend was admonished to appear when required and to attend the courtroom of the judge who would next hear the case. The court told the defendant that her lawyer had left the courtroom and would not be with her and she should think about whether she has money to retain new counsel or whether she needed appointed counsel.
At that point, the court declared a mistrial. (Transcript at 107.)
Findings and Conclusions
Defense counsel had to be excused in this case because on this record there was an actual continuing conflict of interest that was so serious that it could not be waived, because defense counsel refused to participate in the proceedings on the conflict question, and because he removed himself from representing the defendant by abandoning her in the courtroom. The necessity of a change in counsel representing the defendant after the trial had begun and the jury sworn under the circumstances here required a mistrial based on manifest necessity. (Matter of Fonvil v Molea, 299 AD2d 550 [2d Dept 2002] [dismissing a CPLR article 78 proceeding to bar a second trial], lv denied 99 NY2d 609 [2003].)
*671 The right to counsel of choice is not absolute. It is balanced by consideration of the public’s perception of the judicial system, the integrity of the judicial system, and the enforcement of ethical standards for legal practice. When these interests are in need of protection, they even override a waiver of the right to client confidentiality and justify the removal of defense counsel from a case. (Wheat v United States, 486 US 153 [1988]; Matter of Abrams, 62 NY2d 183, 196 [1984]; People v Hall, 46 NY2d 873 [1979], cert denied 444 US 848 [1979]; People v Jones, 2 AD3d 1397 [4th Dept 2003], lv denied 2 NY3d 742 [2004]; People v Gordon, 272 AD2d 133 [1st Dept 2000], lv denied 95 NY2d 890 [2000]; People v Blaylock, 266 AD2d 400 [2d Dept 1999], lv denied 94 NY2d 877 [2000]; People v Mackey, 175 AD2d 346 [3d Dept 1991], lv denied 78 NY2d 969 [1991]; People v Liuzzo, 167 AD2d 963 [4th Dept 1990], lv dismissed 77 NY2d 866 [1991]; People v Scotti, 142 AD2d 616 [2d Dept 1988], lv denied 72 NY2d 961 [1988]; see People v Ortiz, 76 NY2d 652 [1990].)
Here, defense counsel who represented the defendant had, in the past, represented her erstwhile boyfriend. Defense counsel’s representation of defendant and his previous representation of the boyfriend who was to be a witness against the defendant was a conflict of interest. (People v Hall, 46 NY2d 873 [1979].) In Hall, defense counsel learned that he had previously represented a person who was to be called as an identification witness against the then defendant-client. The Court wrote that the client was not the one to determine whether the attorney continued the representation and that the counsel was properly disqualified when continued representation “work[s] unfair prejudice either to the prosecution or to defendant.” (People v Hall, 46 NY2d at 875; see also People v Gordon, 272 AD2d 133 [2000].)
Counsel, circumscribing his disclosures, did not say when the representation had occurred, but that is irrelevant because the duty of confidentiality lasts forever. (Kitz v Buckmaster, 45 App Div 283, 285 [4th Dept 1899] [once the attorney-client privilege attaches, it “shall remain forever inviolable”], lv denied 47 App Div 633 [4th Dept 1900]; Radovic v City of New York, 168 Misc 2d 58, 60-61 [Sup Ct, NY County 1996]; People v George, 104 Misc 2d 630 [Sup Ct, Bronx County 1980]; see Matter of Priest v Hennessy, 51 NY2d 62, 67-68 [1980] [the attorney-client privilege “exists to ensure that one seeking legal advice will be able to confide fully and freely in his attorney, secure in the knowledge that his confidences will not later be exposed to public view to his embarrassment or legal detriment”].)
*672 Further,
“[t]he duty of loyalty to a former client is broader than the attorney-client privilege and an attorney is not free to attack a former client with respect to the subject matter of the earlier representation even if the information used in the attack comes from sources other than the former client.” (People v Liuzzo, 167 AD2d at 963; see Wise v Consolidated Edison Co. of N.Y., 282 AD2d 335, 335 [1st Dept 2001] [“The ethical obligation to maintain the confidences and secrets of clients and former clients is broader than the attorney-client privilege, and exists without regard to the nature or source of information or the fact that others share the knowledge” (internal quotation marks omitted)], lv denied 96 NY2d 717 [2001].)
Under the relevant conflict rules of the Code of Professional Responsibility, which apply to former clients (People v Liuzzo, 167 AD2d 963 [1990]), the representation of the defendant by counsel was improper. (Code of Professional Responsibility DR 5-105 [A], [B], [C] [22 NYCRR 1200.24 (a), (b), (c)]; NY St Bar Assn Comm on Prof Ethics Op 290 [1973].)
The conflict here was not merely one that would become manifest at the trial. Confidentiality was actually breached in the courtroom when counsel stated on the record before the boyfriend arrived in the courtroom that the boyfriend had “certain problems” in his background about which the prosecutor would have learned in an interview of the boyfriend. Counsel gave no indication that he had obtained from the boyfriend permission to make this disclosure which was otherwise a breach of the privilege.
The People’s theory of the case highlighted the actual conflict. The prosecutor’s theory was that the boyfriend was a prime mover in the conduct that resulted in the commission of the crime charged. While he was not charged as an accomplice, his testimony was crucial in explaining how it was that the defendant’s allegedly false statements came to be known by the police and whether the defendant’s conduct caused the events that occurred. When called by the People as a witness, the boyfriend would have been subject to cross-examination to impeach his credibility. To represent the defendant, counsel would have necessarily questioned the boyfriend about his prior criminal record, any underlying information about that record, and any prior bad acts.
*673 When counsel was informed that the court viewed the situation as a conflict, counsel said there would be a “severe conflict” if the boyfriend testified in a manner different than he, counsel, understood. Counsel’s assumption that what the boyfriend had to say would avoid a conflict was unexplained by him and no effort was made to set out the reasons why there was no conflict. Rather, counsel asked for an offer of proof from the prosecutor about what the boyfriend would say. The record here shows that before January 4, 2005, the prosecutor had not spoken to the boyfriend and was not sure that the boyfriend had received communications sent from the prosecutor’s office. According to the prosecutor, the first conversation with the boyfriend occurred early on the morning of January 4, 2005. At that time the boyfriend said that he would not testify against the defendant. After a brief recess, the prosecutor told the court and defense counsel that the detective sent to the boyfriend’s place of employment to transport him to the courthouse was en route to the courthouse and that the boyfriend was cooperating. These representations to the court provided a basis to believe that defense counsel’s representation about the boyfriend’s testimony did not show the absence of a conflict, but only an improper reluctance by the boyfriend to give testimony.
The offer of proof that defense counsel had requested on the issue of whether, as counsel himself described it, there was a “severe conflict” could have been forthcoming. The boyfriend was en route to the courthouse. The prosecutor could have questioned him and made the offer of proof about the boyfriend’s expected testimony in the presence of defense counsel. However, that opportunity was lost when the defense counsel left the courtroom just after the boyfriend appeared in the company of the prosecutor’s investigators. Counsel did not return, leaving the defendant unrepresented and foreclosing any further proceedings in the case before the court. At this point the case was scheduled before the court that had forwarded it for trial and a mistrial was declared.
As set out above, the conflict and the counsel’s behavior each provided necessity for a mistrial. When the conflict was raised by the court or the prosecutor during the extensive colloquy, counsel changed the subject to argue about the missing 911 tapes, a statement made by the boyfriend outside the defendant’s home, the defendant’s statement at the time of her arrest, and the insufficiency of the complaint. Counsel never addressed himself to the conflict to enable an exploration of the *674 matter. Counsel never explained why the situation did not represent a conflict, despite clear ethics and judicial rulings that controlled the situation.
Rather the defense counsel disowned his burden of showing there was no conflict and placed the burden of proving the conflict on the prosecutor by asking for an offer of proof. When that offer became possible because the boyfriend appeared in the courtroom, counsel prevented any further proceedings by leaving the courtroom and his client.
Counsel’s own conduct in representing the defendant when there was an actual conflict and his refusal to participate in the proceedings that would have given him the opportunity to show that there was no conflict made the mistrial manifestly necessary. (People v Savinon, 293 AD2d 413 [1st Dept 2002], affd on other grounds 100 NY2d 192 [2003] [counsel’s own conduct violated the Rape Shield Law and required a mistrial]; Matter of Maynard v Wait, 246 AD2d 853 [3d Dept 1998] [counsel violated the Rape Shield Law and after considering counsel’s arguments a mistrial was required]; People v Anderson, 186 AD2d 140 [2d Dept 1992] [where defense counsel had been suspended from practice, a mistrial was needed], lv denied 80 NY2d 1025 [1992]; Matter of Scott v D'Amico, 170 AD2d 1040 [4th Dept 1991] [lawyer’s objection to a continuance for the appearance of a prosecution witness necessitated a mistrial], lv dismissed 77 NY2d 987 [1991].) This court finds that the prosecutor did not act to cause a mistrial and that a mistrial was manifestly necessary based on the circumstances set out herein.

 In the long postopening colloquy, the following issues were raised: the destruction of the tape recording of the 911 call; the People’s request to use a Sprint report as evidence of the call; defendant’s statement to the police, about which no evidence had been produced at the Miranda hearing; the scope of the CPL 710.30 notice; the admissibility of a statement by the boyfriend to the police; and the sufficiency of the complaint.