This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-------------------------------------------------------------------

No. 16
In the Matter of 381 Search
Warrants Directed to Facebook,
Inc., &c.

Facebook, Inc.,
            Appellant,
        v.
New York County District
Attorney's Office,
            Respondent.
(And Another Proceeding.)


            Thomas H. Dupree, Jr., for appellant.
            Cyrus R. Vance, Jr., for respondent.
            New York Civil Liberties Union et al.; Foursquare Labs,
Inc. et al.; Brennan Center for Justice at NYU et al.; District
Attorneys Association of the State of New York; Matthew L. Biben
et al.; Amazon.com, Inc. et al., amici curiae.




STEIN, J.:

        In this matter, we are asked to determine the

appealability of two Supreme Court orders.  The first order

denied Facebook, Inc.'s motion to quash certain warrants, issued

pursuant to the federal Stored Communications Act, that sought

the account information and communications of various Facebook

- 1 -

subscribers in connection with a criminal investigation.  The second order denied Facebook's motion to compel disclosure of the affidavit supporting the warrant application.

This case undoubtedly implicates novel and important substantive issues regarding the constitutional rights of privacy and freedom from unreasonable search and seizure, and the parameters of a federal statute establishing methods by which the government may obtain certain types of information.  Nevertheless, while it may be tempting for this Court to address those issues, we must -- in this case as in every other case -- first ascertain whether we possess the necessary jurisdiction to do so under our own constitution and statutes.  This presents equally important issues regarding the separation of powers among our three branches of government.  With these principles in mind, because the orders resolving Facebook's motions relate to warrants issued in a criminal proceeding, and the Criminal Procedure Law does not authorize an appeal from either order, we are constrained by law to affirm the Appellate Division order dismissing Facebook's appeals to that Court.

I.

In July 2013, Supreme Court issued 381 warrants directed at Facebook upon a warrant application by the New York County District Attorney's Office that was supported by an investigator's affidavit.  The warrants, based upon a finding of probable cause, sought subscriber information and content from

numerous user accounts in connection with a pending criminal investigation into allegations of widespread Social Security Disability fraud involving the crimes of larceny and filing a false instrument. The warrants directed Facebook "to retrieve, enter, examine, copy, analyze, and . . . search [each] TARGET FACEBOOK ACCOUNT for the . . . [specified] evidence and property, and . . . to bring it before the [c]ourt without unnecessary delay." The specified evidence included, among other things, each target account holder's profile information, contact and financial account information, groups, photos and videos posted, historical login information, and "[a]ny public or private messages." The warrants prohibited Facebook from notifying its subscribers or otherwise disclosing the existence or execution of the warrants, in order to prevent interference with the investigation.

Facebook moved to quash the warrants, arguing that they were constitutionally defective because they were overbroad and lacked particularity; Facebook also challenged the nondisclosure component of the warrants. Supreme Court denied the motion, holding that Facebook lacked standing to assert any expectation of privacy or Fourth Amendment challenge on behalf of the individual account holders and that, in any event, the warrants were supported by probable cause and were not unconstitutionally overbroad. Supreme Court also rejected Facebook's challenge to the nondisclosure clauses of the warrants, concluding that

disclosure of the warrants to the subscribers would risk jeopardizing the ongoing criminal investigation.  The court directed Facebook to immediately comply with the warrants.

Facebook appealed Supreme Court's order, and sought a stay thereof pending resolution of its appeal.  After the Appellate Division denied Facebook's application for a stay, Facebook complied with the warrants and furnished the requested digital data.

While Facebook's appeal was still pending, some of the targeted Facebook users were indicted for crimes stemming from the disability fraud investigation.  The warrants and the investigator's supporting affidavit were eventually unsealed by orders of Supreme Court, and Facebook was then permitted to notify the targeted individuals of the existence of the warrants. Despite the unsealing orders, however, the District Attorney's Office refused to disclose the supporting affidavit to Facebook or the general public.  Facebook, therefore, moved for an order compelling disclosure of the affidavit.  The District Attorney's Office opposed the motion, arguing that the unsealing orders did not render the affidavit available to the public, and asserting that the affidavit had not yet been provided to the targeted individuals who were being criminally prosecuted.  Supreme Court denied Facebook's motion to compel disclosure of the affidavit, and Facebook appealed that order, as well.

In a single order, the Appellate Division dismissed

both of Facebook's appeals on the ground that they were taken from nonappealable orders (132 AD3d 11 [1st Dept 2015]).  As relevant here, the Appellate Division explained that "[d]irect appellate review of interlocutory orders issued in a criminal proceeding is not available absent statutory authority" (id. at 18).  Inasmuch as "neither CPL article 690[, governing warrants], nor CPL article 450, which sets forth when a criminal appeal can be taken, provides a mechanism for a motion to quash a search warrant, or for taking an appeal from a denial of such a motion," the Appellate Division concluded that the orders denying Facebook's motions were not appealable (id.).  In so holding, the Appellate Division rejected Facebook's request that the court treat the warrants as civil subpoenas for appealability purposes (see id. at 18-20).

This Court granted Facebook leave to appeal (26 NY3d 914 [2015]), and we now affirm.

## II.

The warrants in question were issued, in accordance with the procedures of CPL article 690, pursuant to Title II of the Electronic Communications Privacy Act of 1986, officially entitled the "Stored Wire and Electronic Communications and Transactional Records Access" and commonly referred to as the Stored Communications Act or the SCA (see Electronic Communications Privacy Act, Pub L 99-508, 100 Stat 1848 [1986] [codified as amended at 18 USC §§ 2701 et seq.]).  When enacting

the SCA, Congress observed that the "law must advance with the technology to ensure the continued vitality of the [F]ourth [A]mendment" (S REP 99-541, 99th Cong, 2nd Sess, reprinted in 1986 US Code Cong & Admin News at 3555, 3559).  The SCA was, therefore, meant "to protect privacy interests in personal and proprietary information" transmitted through then-emerging computer-based forms of communication, but it was also enacted to strike a "balance" between privacy expectations and protecting "the Government's legitimate law enforcement needs" (id. at 3557).

To that end, the SCA prohibits the providers of electronic communication and remote computing services[1] from disclosing information regarding subscriber accounts, or the contents of subscriber communications, with certain exceptions provided elsewhere in the statute (see 18 USC § 2702 [a]).  Section 2703 sets forth exceptions to the prohibition on disclosure with respect to the obligation of providers to release information to governmental authorities (see id. § 2703).  Specifically, section 2703 sets forth three primary methods by which a governmental entity may obtain disclosure: (1) a "warrant" issued in accordance with state or federal criminal

---

[1]  An "electronic communication service" is "any service which provides to users thereof the ability to send or receive wire or electronic communications" (18 USC § 2510 [15]; see 18 § USC 2711 [1]), whereas a "remote computing service" provides "to the public . . . computer storage or processing services by means of an electronic communications system" (id. § 2711 [2]).

procedure by a court of competent jurisdiction (id. § 2703 [a], [b] [1] [A], [c] [1] [A]); (2) an "administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena" (id. § 2703 [b] [1] [B] [i], [c] [2]); or (3) a court order granted under section 2703 (d) upon a showing of "specific and articulable facts" demonstrating "reasonable grounds" to believe that the information sought is "relevant and material to an ongoing criminal investigation" (id. § 2703 [d]; see id. § 2703 [b] [1] [B] [ii], [c] [1] [B]).

The appropriate method to be used depends on the type of provider, the age of the communication sought, and whether the government seeks disclosure of content-based information (see id. § 2703 [a] - [d]). For example, a governmental entity may obtain disclosure from an electronic communication service of the content of a communication stored for 180 days or less only with a warrant issued by a magistrate upon probable cause and in accordance with the applicable federal or state warrant procedures (see id. § 2703 [a]). Older communications held by an electronic communication service, or communications held for storage by a remote computing service, may be obtained either without notice to the subscriber pursuant to a warrant or with prior notice to the subscriber[2] if the government uses a subpoena or obtains a court order for disclosure under subsection (d) (see

---

[2]  Notice to the subscriber may be delayed in accordance with 18 USC § 2705.

id. § 2703 [b]).  A warrant, subpoena, or court order may be used
to obtain certain non-content-based information, such as a
subscriber's name, address, length of service, telephone records,
or means of payment (see id. § 2703 [c]).

The SCA provides that no cause of action will lie
against a provider that discloses information "in accordance with
the terms of a court order, warrant, [or] subpoena" issued under
the statute (id. § 2703 [e]; see id. § 2707 [e] [1]).
Nevertheless, subsection (d) of section 2703 allows "[a] court
issuing an order pursuant to this section, on a motion made
promptly by the service provider, [to] quash or modify such
order, if the information or records requested are unusually
voluminous in nature or compliance with such order otherwise
would cause an undue burden on such provider" (id. § 2703 [d]).
The primary question before us in this appeal is whether --
assuming, without deciding, the propriety of a motion to quash an
SCA warrant (as opposed to a subsection [d] court order) in the
first instance -- an order resolving a motion to quash SCA
warrants is appealable.

III.

That the SCA draws a distinction between warrants and
subpoenas, and the content that may be obtained therewith, is of
critical significance with respect to a determination of
appellate jurisdiction over the appeal from the denial of
Facebook's motion to quash.  It is a fundamental precept of the

jurisdiction of our appellate courts that "'[n]o appeal lies from a determination made in a criminal proceeding unless specifically provided for by statute'" (People v Lovett, 25 NY3d 1088, 1090 [2015], quoting People v Pagan, 19 NY3d 368, 370 [2012]; see NY Const, art VI, § 3 [b]; People v Bautista, 7 NY3d 838, 838-839 [2006]; People v Hernandez, 98 NY2d 8, 10 [2002]; People v De Jesus, 54 NY2d 447, 449 [1981]; People v Zerillo, 200 NY 443, 446 [1911]).  No provision of the Criminal Procedure Law articles that govern appeals -- which are among "'the most highly structured and highly particularized articles of procedure'" (Hernandez, 98 NY2d at 10, quoting People v Laing, 79 NY2d 166, 171 [1992]) -- authorizes an appeal to either an intermediate appellate court or to this Court from an order denying a motion to quash or vacate a search warrant (see CPL art 450; CPL 470.60).  Moreover, no civil appeal may be brought from an order entered in a criminal action or proceeding (see NY Const, art VI, § 3 [b]; CPLR 5601; CPL 450.90).

Consequently, we have held for decades that "no appeal lies from [an] order denying . . . [an] application to vacate a search warrant . . . as this is an order in a criminal [case], [and] an appeal from [such an order] is not provided for" by statute (Matter of Police Benevolent Assn. of N.Y. State Police v Gagliardi, 9 NY2d 803, 803-804 [1961] [emphasis added]; see also Matter of Abe A., 56 NY2d 288, 293 [1982]).  By contrast, a motion to quash a subpoena issued prior to the commencement of a

criminal action, even if related to a criminal investigation, "is civil by nature" (Matter of Abrams [John Anonymous], 62 NY2d 183, 192 [1984]; see Matter of Newsday, Inc., 3 NY3d 651, 652 [2004]; People v Santos, 64 NY2d 702, 704 [1984]).[3]  Thus, an order resolving a motion to quash such a subpoena is a final and appealable order in a special proceeding that is "not subject to the rule restricting direct appellate review of orders in criminal proceedings" (Matter of Abrams, 62 NY2d at 192; see Matter of Newsday, 3 NY3d at 651 n).

In the instant matter, Facebook concedes that an order addressing a motion to quash a warrant is not appealable, but Facebook contends -- and the dissent agrees -- that, despite being denominated as "warrants," SCA warrants are more analogous to subpoenas than to traditional search warrants involving tangible property because they compel third parties to disclose digital data.  Thus, Facebook and the dissent urge us to treat Supreme Court's first order denying its motion to quash the warrants as an appealable order denying a motion to quash subpoenas.  This argument is unpersuasive.

It is true that the method of compliance with an SCA

---

[3]  The appealability of an order resolving a non-party's motion to quash a subpoena issued after the commencement of a criminal action and the propriety of the Appellate Division cases relied on by the dissent (see e.g. People v Marin, 86 AD2d 40, 42 [2d Dept 1982]), of which we have never approved (see People v Santos, 64 NY2d 702, 704 [1984]), are not before us on this appeal.

warrant has some characteristics that resemble a response to a subpoena.  Most prominently, an SCA warrant compels a third party -- here, Facebook -- to compile and turn over digital data under its control, and the presence of a law enforcement officer is not required for service or execution of the warrant (see 18 USC § 2703 [g]).  A traditional search warrant, by comparison, authorizes law enforcement to enter, search, and seize property (see CPL 690.05 [2]).  These differences in execution, however, can be easily explained by the nature of the material sought.  The service provider is more likely to be better equipped to access and conduct a search of its own digital information than law enforcement personnel (see generally United States v Bach, 310 F3d 1063, 1067 [8th Cir 2002]), and the data may be stored in different locations.  Thus, the framework of execution for SCA warrants ensures efficiency and minimizes intrusion into the provider's business while promoting and protecting legitimate law enforcement interests in criminal investigation.  Despite the minor similarities between SCA warrants and subpoenas, in this post-digital world, we are not convinced that SCA warrants -- which are required under the statute to obtain certain content-based information that cannot be obtained with a subpoena due to heightened privacy interests in electronic communications (see 18 USC § 2703 [a], [b] [1] [A]; S REP 99-541, 1986 US Code Cong & Admin News at 3559) -- should nevertheless be treated as subpoenas.

Initially, the SCA plainly distinguishes between subpoenas and warrants, and there is no indication that Congress intended for SCA warrants to be treated as subpoenas. Indeed, to so hold, would be to ignore the plain language of the SCA in contravention of the rules of statutory interpretation (see People v Jones, 26 NY3d 730, 733 [2016]; Matter of DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660 [2006]). As the Second Circuit recently explained,

> "[w]arrants and subpoenas are, and have long been, distinct legal instruments. Section 2703 of the SCA recognizes this distinction and, unsurprisingly, uses the 'warrant' requirement to signal (and to provide) a greater level of protection to priority stored communications, and 'subpoenas' to signal (and provide) a lesser level. Section 2703 does not use the terms interchangeably. Nor does it use the word 'hybrid' to describe an SCA warrant. . . . We see no reasonable basis in the statute from which to infer that Congress used 'warrant' to mean 'subpoena'"

(Matter of Warrant to Search a Certain E-Mail Account Controlled and Maintained by Microsoft Corp., 829 F3d 197, 214 [2d Cir 2016] [internal citations omitted], rehearing denied ___ F3d ___, 2017 WL 362765 [2d Cir Jan. 24, 2017]). Notably, the Second Circuit is not alone in refusing to equate SCA warrants with subpoenas. The Eighth Circuit has also observed that, "[w]hile warrants for electronic data are often served like subpoenas (via fax), Congress called them warrants and . . . Congress intended them to be treated as warrants" (Bach, 310 F3d at 1067 n 1).

Significantly, under our own jurisprudence, we must

"look[] to the true nature of [a] proceeding and to the relief sought in order" to determine whether the proceeding is a special civil proceeding giving rise to an appealable order or, instead, a criminal proceeding for which an appeal must be statutorily authorized (Matter of Abrams, 62 NY2d at 191). Conducting that analysis here, we conclude that an SCA warrant -- and the relief sought in a challenge to such a warrant -- arises in a criminal, not a civil, proceeding.

Unlike a subpoena, which finds broad use in civil matters, an SCA warrant is not "civil by nature" (id. at 192). As with a traditional search warrant, an SCA warrant may be issued only to a governmental entity, upon a showing of probable cause, and pursuant to statutory warrant procedures (see 18 USC § 2703 [a], [b] [1] [A], [c] [1] [A]). In addition, while a subpoena does not commence a criminal proceeding because it is not issued by a court, the issuance of a warrant by the court does just that (see CPL 1.20 [18]; Cayuga Indian Nation of N.Y. v Gould, 14 NY3d 614, 634 [2010]; Matter of B. T. Prods. v Barr, 54 AD2d 315, 319 [4th Dept 1976], affd 44 NY2d 226 [1978]).[4] While

---

[4] The dissent incorrectly asserts that our holdings in these cases undermine our reasoning in the instant matter. In Cayuga Indian Nation of New York v Gould, we held that a declaratory judgment action may be entertained, in the court's discretion and prior to the commencement of a criminal action, where the constitutionality or legality of a statute or regulation is in question and no questions of fact are involved (14 NY3d 614, 634 [2010]). Notably, however, we did not review that part of the order below dismissing the declaratory judgment action insofar as it challenged a search warrant (see id. at 632

the dissent claims that this "misses the point," it is, in fact,

the crux of the matter.  A motion to quash a subpoena that was

not issued by the court may commence a separate civil proceeding;

there is no authority or, indeed, logic, upon which we may

conclude that a motion to quash a warrant that actually commenced

a criminal proceeding, gives rise to yet another proceeding --

this time civil in nature -- that can somehow be separated from

the warrant itself.  Additionally, because SCA warrants are

governed by the same substantive and procedural laws as

traditional search warrants (see generally CPL art 690; CPL art

700; People v Tambe, 71 NY2d 492, 500 [1988]), there is simply no

basis in law for distinguishing such warrants from their

_____

n 7), and Facebook's challenge to the search warrants here would
not fall within the rule articulated in that case allowing for a
declaratory judgment.  Moreover, while the dissent quotes at
length from a passage in Cayuga that the dissent claims directly
contradicts our holding, our discussion of Kelly's Rental v City
of New York (44 NY2d 700 [1978]) in Cayuga merely clarified that
the issuance of a search warrant does not commence a criminal
action or prosecution (which is commenced by the filing of an
accusatory instrument), but it does commence a criminal
proceeding; this principle is entirely consistent with our
holding herein (see Cayuga, 14 NY3d at 634-635).  Likewise, our
ultimate holding in Matter of B.T. Prods. v Barr (44 NY2d 226
[1978]) does nothing to undermine our current assertion that a
search warrant commences a criminal proceeding.  There, the Court
held that, although "[i]n most cases, prohibition will not be
available to challenge the validity of a search warrant," such
remedy may be available where the challenge "goes to jurisdiction
rather than simply to the existence of probable cause in a
particular situation" (id. at 233).  The arguments raised by
Facebook do not implicate the extraordinary and limited remedy of
prohibition, as there is no question that Supreme Court had
jurisdiction to issue the search warrants at issue here.

traditional counterparts for jurisdictional purposes.

Moreover, a challenge to a subpoena, even where related to a criminal investigation, is "limited in scope, challenging only the validity of the subpoena or the jurisdiction of the issuing authority," and "substantial delay in the proceedings is unlikely" to result from permitting appeals from orders deciding such motions (Matter of Santangello v People, 38 NY2d 536, 539 [1976]). By contrast, the issuance of a warrant potentially has significant Fourth Amendment implications. A challenge to criminal warrants, such as the one Facebook raised here,[5] will often seek review of a neutral magistrate's original determination of probable cause upon a sworn affidavit and compliance with the strictures of the Fourth Amendment. It can hardly be disputed that such relief is, quintessentially, of a criminal nature.[6] Accordingly, based on a review of the nature

_____

[5] While Facebook may have alleged that the materials sought by the warrants were unusually voluminous, Facebook made no argument below that the warrants imposed any type of administrative burden on it with respect to compliance. At the trial level, Facebook sought only to challenge the warrant on constitutional grounds and alleged voluminosity only in the context of its overbreadth argument.

[6] The dissent's point that a motion to quash an SCA warrant may not always seek to raise an argument attacking the warrant on constitutional grounds is of no moment. That such relief may be sought is sufficient to aid us in determining that the matter at hand is a criminal one. Furthermore, the dissent's assertion that Facebook's standing to raise Fourth Amendment claims "has nothing to do with criminal law" ignores that other courts have found the issue of third party standing in the Fourth Amendment context more complex (see e.g. Microsoft Corp. v United States Dept. of Justice, C16-0538JLR, 2017 WL 530353, at *15 [WD Wash

of the proceeding and the relief sought -- not merely on strict adherence to the term "warrant," as the dissent claims -- we conclude that the orders below related to criminal search warrants issued in connection with a criminal investigation and, therefore, the order denying Facebook's motion to quash is one made in a criminal proceeding (see Matter of Abrams, 62 NY2d at 191. Thus, the order is not appealable (see Matter of Police Benevolent Assn. of N.Y. State Police, 9 NY2d at 803-804; see also Matter of Alphonso C., 38 NY2d 923, 924 [1976]). Indeed, to hold otherwise would be to impermissibly and judicially create a right to appeal in a criminal matter that has not been authorized by our legislature (see NY Const, art VI, § 3 [b]; Hernandez, 98 NY2d at 10).

IV.

The dissent posits that Facebook must have a right to appeal in state courts, despite the absence of any statutory predicate under state law, on the ground that the SCA provides Facebook with a right to bring a motion to quash in the first instance and, thus, "normal federal rights of appeal apply" (dissenting op at 8). While we decline to opine on the propriety of a motion to quash a warrant under 18 USC § 2703 (d), suffice it to say that the dissent's argument, which is essentially a

---

Feb. 8, 2017]; see also Alderman v United States, 394 US 165 [1969]; Rakas v Illinois, 439 US 128 [1978]). Nevertheless, we take no position on the merits of that issue, as it is not properly before us.

preemption argument,[7] relies on two flawed premises.  First, the dissent inaccurately characterizes the SCA as authorizing a "freestanding cause of action" for providers to move to quash SCA warrants (dissenting op at 8).  Second, the dissent concludes that an SCA "warrant" is equivalent to an "administrative subpoena," despite the clear and unmistakable distinction between the two intended by Congress, as reflected in the statutory language of the SCA.

The SCA -- which recognizes a variety of causes of action in connection with the release of electronic data that do not apply here (see 18 USC § 2707) -- does not provide a third party with an independent cause of action under section 2703 (d) to challenge the issuance of either a warrant, subpoena, or court order.  Rather, that section merely authorizes the provider to make a "motion" to a court that has already issued an "order" (id. § 2703 [d]); in other words, section 2703 (d) provides for a motion in an already-existing proceeding, not the commencement of a new and separate proceeding.

Nor does the SCA provide a third party who makes a motion to quash with an express right to appeal the determination

---

[7]  Notably, the parties to the appeal before us do not raise a preemption argument.  This Court generally refrains from addressing issues not argued by the parties, as we have recognized that, to do otherwise, would be unfair to the litigants, "who expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made" (Misicki v Caradonna, 12 NY3d 511, 519 [2009]).

of such a motion.  The federal courts of appeals have jurisdiction over "final decisions" of the federal district courts (28 USC § 1291).  A final decision is one that, unlike the orders at issue here, "'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment'" (Coopers & Lybrand v Livesay, 437 US 463, 467 [1978], quoting Catlin v United States, 324 US 229, 233 [1945]).  Generally, due to this limitation on federal appellate jurisdiction, "one to whom a subpoena is directed may not appeal the denial of a motion to quash that subpoena but must either obey its commands or refuse to do so and contest the validity of the subpoena if he is subsequently cited for contempt on account of his failure to obey" (United States v Ryan, 402 US 530, 532 [1971]; see Cobbledick v United States, 309 US 323, 330 [1940]).  As the dissent notes, federal courts have held that "[a] district court order enforcing a subpoena issued by a government agency in connection with an administrative investigation may be appealed immediately without first performing the ritual of obtaining a contempt order" (United States v Construction Prods. Research, Inc., 73 F3d 464, 468 [2d Cir 1996] [emphases added]).  However, this is a narrow exception to the general rule barring appeals from motions to quash due to a lack of finality, which rule "applies whether the subpoena is issued in connection with civil and criminal actions, or grand jury proceedings, and whether the person (or entity) seeking to prevent enforcement of the subpoena

is a party to the litigation or a non-party witness" (Matter of Air Crash at Belle Harbor, New York on November 12, 2001, 490 F3d 99, 104 [2d Cir 2007]; Construction Prods. Research, Inc., 73 F3d at 469; see 28 USC § 1291; Ryan, 402 US at 532-533).

Notably, the exception permitting appeals of administrative subpoenas has not been extended to warrants, as "[a]n order denying the suppression of evidence or denying a motion to quash a warrant in a criminal trial is interlocutory and generally not appealable by a private party until a final judgment in the case has been rendered" (Matter of 949 Erie St., Racine, Wis., 824 F2d 538, 540 [7th Cir 1987]; see Matter of Consol. Rail Corp., 631 F2d 1122, 1125 [3d Cir 1980]; see also Di Bella v United States, 369 US 121, 129 [1962] ["An order granting or denying a pre-indictment motion to suppress does not fall within any class of independent proceedings otherwise recognized by this Court, and there is every practical reason for denying it such recognition. To regard such a disjointed ruling . . . as the termination of an independent proceeding, with full panoply of appeal and attendant stay, entails serious disruption to the conduct of a criminal trial"]; Matter of Search of Elec. Communications in the Account of chakafattah gmail.com at Internet Serv. Provider Google, Inc., 802 F3d 516, 525 [3d Cir 2015]). This makes sense because the rationale behind the exception allowing appeals of administrative subpoenas is that an "administrative proceeding is self-contained and, unlike in the

case of a grand jury or trial, there is no 'further judicial
inquiry which would be halted were the offending [subpoenaed
party] permitted to appeal'" (Matter of Air Crash at Belle
Harbor, 490 F3d at 105, quoting Construction Prods. Research,
Inc., 73 F 3d at 469).  This exception is facially inapplicable
to warrants issued in criminal proceedings.[8]

        Contrary to the dissent's assertion, neither the Second
Circuit (nor any other court directly addressing appealability)
has determined, or even suggested, that an order denying a motion
to quash an SCA warrant would be treated as a final order in an
independent proceeding or as an order resolving a motion to quash
an administrative subpoena for finality and appealability
purposes.  Indeed, recognizing the finality limitation on the
appellate jurisdiction of federal courts, the parties in Matter

---

[8]  To be sure, federal courts have also recognized an
exception to the principle requiring that a party be found in
contempt to obtain a final judgment "[i]n the limited class of
cases where denial of immediate review would render impossible
any review whatsoever of an individual's claims" (United States v
Ryan, 402 US 530, 533 [1971]).  However, this narrow exception
applies where the party against whom disclosure is sought has an
insufficient stake in the matter to risk a finding of contempt
(see United States v Beltramea, 831 F3d 1022, 1024 [8th Cir
2016]; Matter of Air Crash at Belle Harbor, New York on November
12, 2001, 490 F3d 99, 107 [2d Cir 2007]; Matter of Grand Jury
Proceeding, 528 F2d 983, 984 [5th Cir 1976]; see generally
Perlman v United States, 247 US 7, 13 [1918]).  Here, Facebook
asserts an independent business and financial interest in
ensuring that its users' privacy rights are respected.  Thus, it
follows that denial of review of the order denying its motion to
quash the SCA warrants does not effectively render review
impossible (see generally Firestone Tire & Rubber Co. v Risjord,
449 US 368, 376 [1981]).

of Warrant to Search a Certain E-Mail Account Controlled and
Maintained by Microsoft Corp. (829 F3d at 205) stipulated to a
contempt finding so as to secure appellate jurisdiction (see
generally Ryan, 402 US at 532-533).  Furthermore, the Second
Circuit's conclusion that the plain language of the SCA evidences
Congress's intent to recognize the legal distinction between
warrants and subpoenas profoundly undermines the dissent's
prediction that orders pertaining to such warrants would, for
appealability purposes, be treated as orders relating to
subpoenas (see Matter of Warrant to Search a Certain E-Mail
Account Controlled and Maintained by Microsoft Corp., 829 F3d at
205).

        Nor are we persuaded that federal law would otherwise
preempt our dismissal of these appeals, which rests "squarely on
. . . neutral state rule[s] for administering state court[]"
jurisdiction (Johnson v Fankell, 520 US 911, 912 [1997]).  "The
general rule, 'bottomed deeply in belief in the importance of
state control of state judicial procedure, is that federal law
takes the state courts as it finds them,'" and "[s]tates thus
have great latitude to establish the structure and jurisdiction
of their own courts" (Johnson, 520 US at 919, quoting Hart, The
Relations Between State and Federal Law, 54 Colum L Rev 489, 508
1954]).  Our jurisdictional limitations do not discriminate
against third-party provider claims under the SCA but, rather,
"reflect the concerns of power over the person and competence

over the subject matter that jurisdictional rules are designed to protect" (Haywood v Drown, 556 US 729, 739 [2009]).  Moreover, our holding does not impose any burden on any right the SCA may provide to Facebook to move to quash the warrants at issue here. The SCA provides no express right to appeal, and the United States Supreme Court "has never held that the States are required to establish avenues of appellate review" (M.L.B. v S.L.J., 519 US 102, 111 [1996], quoting Rinaldi v Yeager, 384 US 305, 310 [1966]; see Johnson, 520 US at 919; Kohl v Lehlback, 160 US 293, 299 [1895] ["the right of review in an appellate court is purely a matter of state concern"]).

## V.

To the extent Facebook and the dissent argue that SCA warrants will escape judicial review if orders relating to motions to quash such warrants are deemed not appealable, that argument is also flawed.  By its very nature, a warrant is subject to judicial review because it cannot be issued unless a neutral magistrate makes a finding of probable cause and particularity (see US Const, 4th Amend; NY Const art I, § 12). In addition, there are avenues of relief available to those subjects of SCA warrants who are ultimately prosecuted and who may, therefore, challenge the validity of the warrant on statutory or constitutional grounds, as well as potential civil remedies for those who are not formally accused (see generally 18 USC § 2707; 42 USC § 1983; Bivens v Six Unknown Named Agents of

<u>Fed. Bur. of Narcotics</u>, 456 F2d 1339, 1347 [2d Cir 1972]).

        While Facebook's concerns, as a third party, about
overbroad SCA warrants may not be baseless, we are mindful that
there are counterbalancing concerns that militate against
authorizing appellate review of warrants issued in connection
with criminal prosecutions outside of the review that may be
sought by a criminal defendant following conviction.  For
example, we have cautioned that we must abide by the statutory
authorizations for appeals in criminal cases in order to "limit
appellate proliferation in criminal matters, . . . [because]
[l]itigation may be compounded unduly by protracted and
multifarious appeals and collateral proceedings frustrating the
speedy resolution of disputes" (<u>Matter of State of New York v
King</u>, 36 NY2d 59, 63 [1975]).  Indeed, the United States Supreme
Court has recognized this very same concern for limiting appeals
in criminal actions in the interest of expedient justice (<u>see</u>
<u>Ryan</u>, 402 US at 532).  Any debates about the balancing of such
concerns is beside the point, because the weighing of these
policy considerations is not ultimately within our province.

        "That the Legislature has not authorized an appeal from
an order in a criminal proceeding is conclusive; and 'any
arguments for a change in the practice, however persuasive, must
be addressed to the legislature'" (<u>Matter of Santangello</u>, 38 NY2d
at 539-540, quoting Cohen and Karger, Powers of the New York
Court of Appeals, § 188, at 707).  We "may 'not resort to

interpretative contrivances to broaden the scope and application'
of unambiguous statutes to 'create a right to appeal out of thin
air' in order to 'fill the . . . void, without trespassing on the
Legislature's domain and undermining the structure of article 450
of the CPL'" (People v Stevens, 91 NY2d 270, 279 [1998], quoting
Laing, 79 NY2d at 170-171, 172; see Hernandez, 98 NY2d at 10).
Until such time as the legislature may deem it appropriate to
provide statutory authorization for appellate review, we have
every faith in the competence and efficacy of our trial courts to
resolve any motions properly brought by providers under the SCA
in state courts.

Inasmuch as there is no statutory predicate for
Facebook's appeal from the order denying its motion to quash the
SCA warrants that were issued in a criminal proceeding (see CPL
art 450; CPL 470.60), nor any other legal basis for such appeal,
we must affirm the Appellate Division's dismissal of Facebook's
appeal insofar as taken from that order.  Supreme Court's order
denying Facebook's motion to compel disclosure of the affidavit
is, likewise, not appealable, although Facebook may explore other
procedural avenues to raise its claim (see Matter of Newsday, 3
NY3d at 652).

In light of our holding, we have no occasion to
consider, and therefore do not pass on, the merits of the
parties' arguments regarding Facebook's standing to assert Fourth
Amendment claims on behalf of its users, whether an individual

has a reasonable expectation of privacy in his or her electronic communications, the constitutionality of the warrants at issue, or the propriety of the District Attorney's refusal to release the supporting affidavit.  Nor do we pass on the question of whether 18 USC § 2703 (d) authorizes a motion to quash an SCA warrant in the first instance.  Due to the absence of jurisdiction for Facebook's appeal to either this Court or the Appellate Division, these issues remain open.

Accordingly, the order of the Appellate Division should be affirmed, without costs.

Matter of 381 Search Warrants Directed to Facebook, Inc.
(New York County District Attorney's Office)

No. 16

RIVERA, J.(concurring):

I concur with the majority that the order denying Facebook's motion to quash the warrant is not appealable, but on the narrower basis that Facebook did not assert the grounds provided for under 18 USC § 2703 (d), and, thus, pursuant to section 2703 (a), the order is subject to our state rules and unreviewable. However, I fully agree with and adopt my dissenting colleague's comprehensive and well-reasoned analysis that the Stored Communications Act permits Facebook to appeal the denial of a motion to quash or modify the SCA warrants (dissenting op at §§ I[a], III[a]).

Section 2703 (d) gives service providers standing to move to quash or modify warrants on grounds that "the information or records requested are unusually voluminous in nature or compliance with such order otherwise would cause an undue burden on such provider" (18 USC § 2703 [d]). The plain language of this subsection expressly applies to service providers like Facebook, and to any order issued pursuant to section 2703, including the warrants served on Facebook under the authority of section 2703 (a).

The SCA was designed to "protect legitimate law

- 1 -

enforcement needs while minimizing intrusions on the privacy of system users as well as the business needs of electronic communications system providers" (132 Cong. Rec. S7987-04). Section 2703 (d) therefore encompasses demands to turn over information that impacts the provider's business, reputational, and property interests that may be impacted adversely by an order issued under subsections (a), (b), or (c) of section 2703. Being forced to share material from its users' accounts, unavoidably including material from individuals irrelevant to the state's investigation, may indeed tarnish a service provider's brand and alienate its users (see dissenting op at 12-13; see also In re Apple, Inc., 149 F Supp 3d 341, 368-73 [ED NY 2016]). Therefore, the economic impact on a service provider is sufficient grounds to assert relief in the form of a motion to quash or modify under section 2703 (d).[1]

It is manifest that to adequately protect the service provider's interests, the denial of a motion to quash or modify is appealable as it is a final determination on the propriety of the government's intrusion on those interests. The right to appellate review is part of the statutory framework that protects a service provider from government overreach. As the dissent

---

[1] The SCA protects the rights of providers, not only by explicitly giving them the right to move to quash or modify if the material sought by the warrant is unusually voluminous or would present an undue burden, but also by allowing them to be reimbursed for the costs associated with assembling or providing the material under 18 USC § 2706.

explains, at the heart of our Fourth Amendment protections is the protection of privacy rights against the power of government (see dissenting op at 1-7, 40-42). The type of intrusion at issue here is even broader in many respects than those so familiar to the founders when they ratified the Fourth Amendment.

Contrary to the majority's view, appealability of an order denying a motion to quash is not subject to our state procedural rules governing warrants, because such an order is authorized under section 2703 (d), not 2703 (a). Unlike subsection (a), which expressly refers to state procedures, there is no such language attached to a section 2703 (d) order denying a motion to quash. Absent language indicating the Congressional adoption of state procedures that would limit the protections specifically designed to address the concerns of service providers, there is no legal authority or reason to impose state laws and rules governing state criminal matters on the SCA.

Moreover, the majority ignores the balance of interests reflected in the SCA when it concludes that a service provider who challenges an SCA warrant should be treated the same as a challenger to a subpoena under any other statute. In the latter case, the party has two options: comply or refuse to comply and, if cited, litigate the propriety of the subpoena in a contempt proceeding. The SCA, however, does not impose on service providers this binary, which fails to account for the realities of a technological world of open access and constantly shifting

boundaries of personal privacy.  The SCA balances the interests of government and the service provider so as to avoid the disclosure to law enforcement of highly sensitive and personal information, made easily accessible with a keystroke, when the request is unusually voluminous or would cause an undue burden on the provider (see dissenting op at 10, quoting 132 Cong. Rec. S7987-04).

The majority's reliance on United States v Ryan (402 US 530 [1971]) and a line of cases concerning the finality of various orders under 28 USC § 1291 is misplaced as here federal jurisdiction is not at issue and the order is a final ruling on Facebook's motion under section 2703 (d) (majority op at 18). Regardless, the rule cited by the majority is not hard and fast. The United States Supreme Court has recognized exceptions for a "limited class of cases where denial of immediate review would render impossible any review whatsoever of an individual's claims" (Ryan, 402 US at 533).[2]  There is as good a reason, if not a more compelling basis, to recognize an exception to the

---

[2] Contrary to the majority's claim, while this is a narrow exception, Ryan does not limit it merely to cases "where the party against whom disclosure is sought has an insufficient stake in the matter to risk a finding of contempt" (majority op at 20 n 9).  While the Supreme Court in Perlman v United States (247 US 7, 13 [1918]) stated the case was unique on the merits, it also noted that the government's contention that the party "was powerless to avert the mischief of the order but must accept its incidence and seek a remedy at some other time and in some other way," was "somewhat strange."  Further, Perlman is but "one example" of the limited class of cases referenced in Ryan (United States v Beltramea, 831 F3d 1022, 1024 (8th Cir 2016).

rule requiring that the challenger raise the lawfulness of the order in a contempt proceeding -- if such a rule applied to section 2703 (d) -- given the nature of information sought in an SCA warrant.  A service provider may rightly fear being held in contempt and forego challenging the warrant as the stigma associated with a contempt finding jeopardizes the service provider's stability and business position.  These concerns present a calculus for the provider, and combined with the inherent coerciveness of the choice that risks a finding of contempt, weigh in favor of disclosure.  While any challenger faces similar concerns, not every challenger has access to the sheer volume of intimate interpersonal information held by Facebook and other service providers.  There is simply no basis to hold fast to a paradigm that encourages disclosure without addressing the unique circumstances presented when government demands the cache of information stored by service providers.[3]

Although I agree with the dissent that Facebook could move to quash on the grounds set forth in section 2703 (d) and that the SCA permits an appeal from an adverse determination of such motion, because Facebook did not assert in the first instance that the information or records requested were unusually

---

[3] Since the matter is expressly addressed by section 2703 (d), and Facebook relies on this subsection to support review on the merits, I have no reason to consider the dissent's analysis of standing under common law and federal law, and express no opinion on these alternative legal bases for appellate review.

voluminous, that compliance would cause an undue burden, or that its business, reputational, or property interests were endangered by the warrant, I agree with the majority that the Appellate Division should be affirmed. Facebook asserted the rights of its users grounding its challenge on claims that the warrants are constitutionally infirm because "(1) the searches they authorize are overbroad, and (2) the warrants lack particularity." The SCA does not contemplate a service provider's motion to quash to protect its users' rights. Those rights are protected by the Fourth Amendment, CPL 690, CPL 710, and 42 USC § 1983 (see majority op at 22-23). Therefore, Facebook did not assert a basis for relief within the purview of section 2703 (d).

The District Attorney's warrant was issued under section 2703 (a), which expressly states that SCA warrants are "issued using State warrant procedures." For the reasons stated by the majority, an order denying a motion to quash such a warrant on grounds of the users' rights is not appealable under this Court's current jurisprudence (majority op at 9-15).[4]

---

[4] Facebook has not properly asserted claims under our state constitution so I have no occasion to opine as to whether under our broad interpretation of New York's constitutional guarantees a service provider may appeal an order denying relief from an SCA warrant on the basis of its users' interests (see e.g. Cooper v Morin, 49 NY2d 69, 79 [1979] ["We have not hesitated when we concluded that the Federal Constitution as interpreted by the Supreme Court fell short of adequate protection for our citizens to rely upon the principle that that document defines the minimum level of individual rights and leaves the States free to provide greater rights for its citizens through its Constitution, statutes or rule-making authority."]).

Matter of 381 Search Warrants Directed to Facebook, Inc.

(New York County District Attorney's Office)


No. 16


WILSON, J.(dissenting):

The Fourth Amendment to the U.S. Constitution, urged on the nation by the New York ratifying convention in 1788 (William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning, 602-1791, 695 [1st ed 2009]), secures us against unreasonable searches and seizures by our government.  It reflects the American consensus that the general warrants and writs of assistance popular among British officials in colonial government -- orders that licensed their possessors to scour homes and businesses for anything of potential interest to the Crown, and that were a significant provocation to the revolutionary sentiment then taking hold in New England -- had no place in a nascent republic that so deeply abhorred arbitrary power.[1]

The Amendment's effect is "to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority" (Weeks v United States, 232 US 383, 391-92 [1914]).[2]  Although the Supreme Court initially

_____

[1] For a concise history of the Fourth Amendment and its importance, see Boyd v United States (116 US 616 [1886]).

[2] Since Mapp v Ohio (367 US 643 [1961]), the Fourth Amendment has applied with equal force to state officials.

- 1 -

interpreted those limits as applying to searches of material things only (Olmstead v United States, 277 US 438 [1928]), it has, since Katz v United States (389 US 347 [1967]), extended the protections to communications in which one has a reasonable expectation of privacy.

Although the framers of the U.S. Constitution knew only the technologies of the 1780s, the framers of the New York Constitution's provision against unreasonable searches and seizures worked 150 years later and knew more.  Our state constitution, unlike its federal counterpart, includes explicit protections against unreasonable searches and seizures of electronic communications (NY Const., art. I § 12).

In 1938 -- after an "epochal debate" among the delegates to that year's constitutional convention that aroused the interest of newspaper editorial boards, the letter-writing public, the Governor, and a slew of labor organizations and law enforcement officers (Revised Record of the Constitutional Convention of the State of New York at 553 [1938]) -- the People approved what became article I, § 12.  That section did not merely incorporate verbatim the protections of the Fourth Amendment, but expressly extended those protections to telecommunications.  The delegates who drafted Section 12, whose discussions thereof stretched over more than three weeks of the convention and nearly five hundred pages of the revised record of its proceedings, agreed that technological advances (whether the telegraph using radio waves,

the telephone using copper wires or, by extension, the Facebook
message using fiber-optic cable or a different frequency of the
radio spectrum) are entitled to the same protections as their
more ancient but analogous precursors (Revised Record at 340,
530).[3] They were also clear that New Yorkers retain a reasonable
expectation that materials will remain private <u>from the
government</u> even if they are divulged to their intended
recipients, to third parties incident to the means of
communication (such as a telegraph operator), or to a wide
universe of friends and neighbors sharing a party line (Revised
Record at 541, 558).[4]

---

[3] A letter addressed to the Convention from then-Governor
Herbert Lehman suggested that "we must be ever vigilant to apply
to new situations, created by modern conditions, principles that
we long ago emblazoned in the Bill of Rights of the Constitution
of the United States" (Revised Record at 340). A delegate made
the analogy explicit, arguing that "originally we had no
telephone or telegraph.  All communications were personal or by
post.  No one has ever permitted or advocated the violation of
the privacy of our mails.  Eavesdropping on personal
communications could easily be detected and prevented, and
privacy thus assured.  Telephone and telegraph, radio and
wireless, are more advances and refinements of personal and
postal communication.  Why are they not entitled to the same
protection? How can anyone justify a different rule applicable to
them?" (<u>id.</u> at 530).

[4] A delegate explained, "In the country where the party wire
is a sort of an institution, it has always been more or less of a
diversion to listen in when the bell rings on the neighbors'
lines . . . Now, as far as the telegraph is concerned, we take a
document down to the telegraph office and we publish it, and
unless it is in code there is not much secrecy with reference to
that" (Revised Record at 541). A subsequent speaker agreed that
"the telephone has never been properly considered a private means
of communication, not even for social calls.  Not alone are there
still party lines, but the central office can cut in, and there

In fact, several prominent delegates thought searches and seizures of telecommunications should be subject to a higher standard of review than searches of physical property precisely because those searches were sure to compromise the privacy of other people.  Those delegates quoted approvingly from Justice Brandeis' prescient dissent in Olmstead:

> "The evil incident to invasion of the privacy of the telephone is far greater than that involved in tampering with the mails. Whenever a telephone line is tapped, the privacy of the persons at both ends of the line is invaded, and all conversations between them upon any subject, and although proper, confidential, and privileged, may be overheard.  Moreover, the tapping of one man's telephone line involves the tapping of the telephone of every other person whom he may call, or who may call him. As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wire tapping."

(277 US at 475-476)

The New York Constitution commands us to guard vigilantly against that evil. We have done so on many occasions by interpreting our own Constitution to provide greater protections than the Fourth Amendment when circumstances warrant (People v Weaver, 12 NY3d 433, 445-446 [2009], collecting cases).

Here, we are asked to decide whether a federal statute, the U.S. Constitution, the New York Constitution, and the law of New

---

is the ever-present possibility of crossed wires, as a result of which conversations are frequently overheard" (Revised Record at 558).

York offer Facebook any meaningful recourse against a warrant authorizing the seizure of private information en masse. The facts are these: On the basis of a single 93-page affidavit (not subsequently shown to Facebook, or to its users whose files were seized, or to the Appellate Division, or to this Court), Supreme Court issued 381 warrants. Those bulk warrants authorized the seizure of what the District Attorney tepidly describes as "specified categories of information," but which functionally amounts to 381 users' entire histories on the platform. At least several of the users were high school students who are unlikely to have themselves been suspects in the investigation. The warrants compelled Facebook to produce not only any and all text, photos, or videos a user had shared with her limited universe of friends, but also any private messages exchanged between the user and another individual (who could have been a spouse, doctor, religious figure, or attorney), as well as information the user had chosen to no longer share with anyone, such as a previous e-mail address, a deleted friend, or a hidden post, and information the user had never intended to share with anyone, such as her searches and location. It also compelled Facebook to produce content shared by users who were not named in the 381 warrants, and may not even have known anyone named in the 381 warrants, but had the misfortune of posting on the timelines of those users,

uploading photos of those users, or simply belonging to any one

of the groups with which a named user was affiliated.[5]

Facebook, which receives tens of thousands of requests from

U.S. law enforcement officials each year and claims that it

willingly complies with the vast majority of them (Facebook

Government Requests Report,

govtrequests.facebook.com/country/United%20States/2016-H1/

[accessed March 3, 2017]), repeatedly attempted to negotiate a

narrower inquiry with the District Attorney's office.  Rebuffed,

Facebook moved the issuing court to quash the warrants.  That

court denied the motion, holding that Facebook lacked standing to

quash the warrants and that the warrants were, in any case,

supported by probable cause.  The court ordered Facebook to

comply with the warrants immediately.  Facebook appealed that

order and sought a stay pending appeal.  After the Appellate

Division denied Facebook's application for a stay, Facebook

complied with the warrants.  The Appellate Division dismissed

Facebook's appeals on the ground that they were taken from non-

appealable orders, but nonetheless appeared to agree with the

summary denial of Facebook's motion for lack of standing.  We

granted Facebook leave to appeal, and now affirm on the grounds

that the orders are non-appealable.[6]

---

[5] Facebook groups can attract millions of members based on shared interests as anodyne as a sports team or as quintessentially sensitive as a political position.

[6] Although the majority and I disagree on the ultimate disposition of this case, it is important to clarify that we

Because the denial of the motion to quash is appealable, and because Facebook clearly has standing to move to quash, I respectfully dissent and would remand the case to the Appellate Division to resolve the motion to quash on the merits.

I.  Appeal Pursuant to the Stored Communications Act

Despite the significant search and seizure issues it presents, the most straightforward way to resolve this case turns not on the state or federal constitutions, but on a federal statute, squarely invoked by Facebook, that simultaneously authorizes the government's warrants and confers on service providers -- such as Facebook --  a right to move to quash those warrants. That statute confers both standing and a freestanding

---

agree certain portions of the Appellate Division's ruling should not be taken to bind the decisions of other courts in this state. Because the majority opinion affirms the lower court's ruling only insofar as the First Department dismissed the appeal as taken from a non-appealable order, the propriety of a motion to quash an SCA warrant in the first instance remains an open question in New York (majority op at __) -- as does whether the Fourth Amendment, to say nothing of article 1, § 12, protects computer records against unreasonable searches and seizures. On the latter question, where the Appellate Division has already misled our trial courts (see People v Thompson, 51 Misc 3d 693, 710-14 [Sup Ct, New York County 2016], criticizing but applying the First Department's assertion that the Fourth Amendment is inapplicable to digital content), the Appellate Division's decision should be vacated or regarded as dicta, based on the majority's holding that the motion to quash was not appealable at all.

cause of action as to which normal federal rights of appeal apply.

The majority construes my dissent as "rely[ing] on [the] flawed conclusion that an SCA 'warrant' is equivalent to an 'administrative subpoena,' despite the clear distinction between the two in the statute." That is not right. First, as explained in Section I (a), Section 2703 (d) concerns all "orders," so that the difference between a warrant and a subpoena is irrelevant to the statutory cause of action provided for by Congress. Second, even in Sections I (b) and I (c), in which I discuss appealability without regard to the statutorily-created cause of action, I do not conclude that SCA warrants and administrative subpoenas are always the same. Instead, under both federal and New York law, the appealability of warrants and subpoenas is not determined by their formal name, but by the circumstances under which they are issued -- most importantly, whether there is a pending criminal action or merely an investigation.

An appeal from the statutorily-granted motion to quash is not an appeal in a criminal proceeding,[7] but in a separate proceeding

---

[7] Hence, the majority's observation, citing several of our decisions, that "a fundamental precept of the jurisdiction of our appellate courts that '"[n]o appeal lies from a determination made in a criminal proceeding unless specifically provided for by statute"'" (majority op at __) has no application here, because the "determination" of Facebook's motion to quash was not "made in a criminal proceeding" (and was authorized by a federal statute). It goes without saying that each of our precedents relied on by the majority concerns a state-law warrant, not a federal SCA warrant that grants a service provider a right to move to quash.

authorized by statute.  The grant or denial of the motion to quash is a final decision, not an interlocutory decision in a criminal proceeding, and is appealable as of right by either party.  Because they have mistakenly assumed that the federal statute's incorporation of state-law procedures for <u>issuing</u> warrants converts the federal statutory action into a traditional state-law warrant, and then applied the "warrant" label without regard to the circumstances present, the majority and the Appellate Division have characterized this appeal as taken from a non-appealable order.

Very simply, because Congress granted service providers a statutory right to move to quash, it automatically provided standing and a right to appeal, absent a clear statement to the contrary.

<u>a.  The SCA Provides Facebook With the Right to Bring a Separate Action to Move to Quash, Including the Right to Appeal.</u>

Both parties to this action agree the bulk warrants served on Facebook were issued pursuant to Section 2703 (a) of the SCA. The SCA provides statutorily-based quasi-Fourth Amendment protections to information sent to electronic communications and remote computing services.  The Act, which also sets out procedures through which a governmental entity may compel such a service to disclose that information, was designed to "protect

legitimate law enforcement needs while minimizing intrusions on the privacy of system users <u>as well as the business needs of electronic communications system providers</u>" (132 Cong. Rec. S7987-04 [emphasis added]).[8]

It accomplishes that balance by providing law enforcement officers with federal statutory authority to compel a third party (such as Facebook here) to execute a legitimate search and seizure, while simultaneously granting service providers a federal right to move to quash or modify problematic orders (§ 2703 [d]).

The parties do not contend, and the majority does not hold, that the Section 2703 (d) right to move to quash or modify an order is available only to those providers served with court orders issued pursuant to Section 2703 (b) or (c), and not to those providers, like Facebook, served with warrants under Section 2703 (a). Although the opening sentences of Section 2703 (d) contain specific provisions that relate only to court orders issued under subsections (b) and (c), the sentence that grants

_____

[8] The SCA's original sponsor, Senator Patrick Leahy, continued to ascribe these three aims to the Act even while this case was being argued below (Statement of Senator Patrick Leahy (D-Vt.), Chairman, Senate Judiciary Committee, On the 27th Anniversary of the Enactment of the Electronic Communications Privacy Act, https://www.leahy.senate.gov/press/statement-of-senator-patrick-leahy-d-vt-chairman-senate-judiciary-committee_on-the-27th-anniversary-of-the-enactment--of-the-electronic-communications-privacy-act- [accessed March 10, 2017]). The majority's description of the SCA as balancing privacy expectations and law enforcement needs (majority op. at __) obliterates Congress' third, and co-equal, concern.

providers a statutory right to move to quash includes all court orders issued "pursuant to this section," <u>i.e.</u> pursuant to Section 2703 generally -- not only orders issued under subsections (b) or (c).[9]  The SCA plainly distinguishes between sections and subsections, and there is no indication that Congress intended for "sections" to be treated as "subsections."

Indeed, to so hold would be to ignore the plain language of the SCA in contravention of the rules of statutory interpretation.  Other courts presented with Section 2703 (d) motions to quash or modify Section 2703 (a) warrants have uniformly held that the statute authorizes a service provider's motion (<u>see</u> <u>e.g.</u>, <u>In re Search of Google Email Accounts</u>, 99 F Supp 3d 992 [D Alaska 2015]; <u>In re Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.</u>, 15 F Supp 3d 466 [SD NY 2014]).[10]

_____

[9] A warrant is a type of order in the federal courts. Although New York law would not determine what Congress meant by "order" in this instance, "a search warrant is a court order" in New York (CPL 690.05).

[10] Even were the final sentence of Section 2703 (d) construed to apply only to court orders for disclosure under subsection (b) or (c), the due process clause of the Fourteenth Amendment would entitle Facebook to a hearing prior to the entry of any order depriving the company of a significant property interest, in this case its employees' time and the public's goodwill.  In <u>United States v New York Tel. Co.</u> (434 US 159 [1977]), the Supreme Court examined the government's power to compel an earlier generation of analogous service providers -- the telephone companies -- to install pen registers and call tracing equipment.  The Court held that the power to "impose duties upon third parties is not without limit; unreasonable

Service providers can invoke the protections of Section 2703 (d) if they have been compelled to disclose an unusual volume of their users' content or to comply with an order that would otherwise unduly burden them.  As Facebook and amici argue, and as the Eastern District of New York concluded (In re Apple, Inc., 149 F Supp 3d 341, 368-73 [ED NY 2016]),[11] undue burdens are not

---

burdens may not be imposed."  Although the Court found no unreasonable burden had been imposed in that case, subsequent Third and Ninth Circuit decisions have held that the risk of an erroneous deprivation of property rights requires a hearing on the issue of burdensomeness before a telephone company can be compelled to cooperate in electronic surveillance, notwithstanding any delay to an investigation that would be caused by a hearing (In re Installation of a Pen Register or Touch-Tone Decoder and a Terminating Trap, 610 F2d 1148, 1156-1157 [3d Cir 1979]; United States v Mountain States Tel. & Tel. Co., 616 F2d 1122, 1132-1133 [9th Cir 1980]).  Internet providers are entitled to at least the same degree of due process protection, which squares with the SCA's provision of a right to move to quash whether the order is a warrant or a subpoena.

[11] The United States District Court for the Eastern District of New York, wrestling in a recent case with the substantively identical "unreasonable burden" language arising out of the New York Tel. Co. line of cases, identified a variety of unreasonable burdens that led it to deny the government's motion to compel Apple  to unlock a suspect's iPhone (In re Apple, Inc., 149 F Supp 3d 341, 368-73 [ED NY 2016]; but see In re XXX, Inc., 2014 WL 5510865 [SD NY 2014]). The Eastern District's argument that "the category of unreasonable burdens is not nearly so narrow" as unreimbursed financial costs arising directly from the work and instead includes compelling a company to act in ways offensive to it or in ways that would tarnish its brand is given credence in this case by the Section 2706 requirement that government entities seeking information from service providers reimburse reasonable and necessary costs "directly incurred in searching for, assembling, reproducing, or otherwise providing such information." Because that requirement would limit the instances in which administrative costs were so unduly burdensome as to be cause to quash or modify a court order, the drafters must have contemplated a more expansive definition of an "undue burden."

limited to the direct administrative costs of compliance (for which the government must reimburse companies under Section 2706).  Compelling a company to disclose the private information of its customers may tarnish its brand or alienate its current or future users, which could constitute an undue burden when evaluated against the scope of the request and its potential benefit to the prosecutor.  As the Third Circuit noted in <u>Pen Register</u>, "[w]ithout a prior hearing, a district court is not likely to learn [that an] order is too burdensome until after the company has carried out the order.  A prior hearing could have the further value of allowing the district court to restrict any excessively burdensome order sufficiently to make it valid" (610 F2d at 1157).

Because Facebook is a "service provider" as defined in the SCA and has alleged that the bulk warrants were unusually voluminous, and because the difference between conducting a targeted search and seizure instead of an overbroad one could make a material difference to the burden imposed on its business, the outcome of Facebook's resort to its federal statutory right to move to quash under Section 2703 (d) cannot properly be dismissed for lack of standing or denied on the merits even if sufficient probable cause existed to justify issuance of the warrants.

---

This is precisely the type of burden recognized by <u>In re Apple</u>'s interpretation of the Supreme Court's holding in <u>New York Tel. Co.</u> (149 F Supp 3d at 368-373).

Facebook has a federal right to appeal an adverse decision
on its motion to quash.  Had the District Attorney gone to
federal court with his affidavit, as the SCA allows, the district
court's ruling on Facebook's motion to quash would have been
appealable to the U.S. Court of Appeals for the Second Circuit.[12]
The federal Courts of Appeals generally have jurisdiction over
appeals from all final decisions of the district courts (28 USC §
1291).  State rules of procedure applicable to garden-variety
warrants cannot be used as a device to contravene or frustrate
federal law.

b.  Even Apart from the SCA, Federal Law Would Allow Facebook to
Appeal the Denial of its Motion to Quash

Even putting aside the statutory authorization granted to a
service provider to move to quash an SCA warrant, and the
concomitant right to appeal, federal law recognizes a fundamental
difference between orders compelling a third party to produce

---

[12]   In Matter of Warrant to Search a Certain E-Mail Account
Controlled & Maintained by Microsoft Corp. (829 F3d 197, 205 n 9
[2d Cir 2016]), the Second Circuit, by citation to its prior
decision in United States v Constr. Prod. Research, Inc. (73 F3d
464, 469 [2d Cir 1996]), suggested that a motion to quash an SCA
warrant issued prior to the commencement of a criminal proceeding
is, by analogy to an administrative subpoena, immediately
appealable.  The issue of the appealability of an SCA warrant was
not presented in that case, because the parties stipulated to a
stayed contempt order, which the district court entered, and
Microsoft amended its notice of appeal in that regard.

information as part of an investigation, and orders compelling a third party to produce information once a criminal proceeding has commenced.  Although subpoenas issued in connection with pending litigation or the grand jury process are not normally considered final (United States v Ryan, 402 US 530, 532-33 [1971]), and even nonparties to those proceedings who wish to obtain immediate appellate review of a subpoena must first defy the order, be held in contempt, and then appeal the contempt order (id. at 532), that rule is inapplicable to district court orders enforcing a subpoena issued by a government agency in connection with an investigation.

Whereas the Ryan rule is designed to discourage (but not bar) appeals that would temporarily halt the litigation or grand jury process, here, "at least from the district court's perspective, the court's enforcement of an agency subpoena arises out of a proceeding that 'may be deemed self-contained, so far as the judiciary is concerned . . . there is not, as in the case of a grand jury or trial, any further judicial inquiry which would be halted were the offending [subpoenaed party] permitted to appeal'" (United States v Constr. Prod. Research, Inc., 73 F3d 464, 469 [2d Cir 1996], quotinq Cobbledick v United States, 309 US 323, 330 [1940]).

The Second Circuit has employed the same reasoning to allow the immediate appeal from an order enforcing an arbitrator's subpoena (Dynegy Midstream Servs., LP c Trammochem, 451 F3d 89,

92-94 [2d Cir 2006] [allowing appeals from independent proceedings in which "a party comes to federal court for the sole purpose of asking the court to issue an order" and dismissing appeals from orders "embedded . . . in the midst of ongoing litigation in the district court"]). Other circuits have allowed the appeal of independent proceedings involving administrative search warrants (Babcock and Wilcox Co. v Marshall Eyeglasses, 610 F2d 1128 [3d Cir 1979]; United States v Stauffer Chemical Co., 684 F2d 1174 [6th Cir 1982]).

That conclusion, which tracks to a considerable extent our own jurisprudence allowing the appealability of an order resolving a nonparty's motion to quash a subpoena issued prior to the commencement of a criminal action, is further bolstered by the SCA's explicit support for Facebook's right to move to quash an order. The Supreme Court has been reluctant to close the doors of the Courts of Appeals to those whose appeal from compulsion rests on statutory provisions (Cobbledick, 309 US at 329).

## c. State Rules of Procedure Cannot Eliminate a Federal Right

The New York Criminal Procedure Law cannot and should not extinguish a service provider's federal right to a fully adjudicated motion to quash, even if that motion is pursued -- at the choice of the government -- in state courts.  To hold otherwise is to contravene both the language and the remedial and

deterrent purposes of the SCA, which here would deprive Facebook

of its only avenue to challenge a potentially significant harm.

Although the SCA incorporates state rules governing the

issuance of the bulk warrants (§ 2703 [a]),[13] the warrants here

are federal warrants issued pursuant to federal statutory law --

not New York State law -- and no provision of the SCA adopts or

references state-law procedures for the appealability of SCA

warrants.  Nor does any portion of the legislative history

suggest that Congress intended to leave appealability of SCA

warrants to the vicissitudes of the appealability rules of the

several states.  It is implausible that Congress, which carefully

balanced Section 2703 (a)'s grant of power with Section 2703

(d)'s check on the same, intended to allow prosecutors to forum

shop for the court with the rules of procedure that would best

evade the statutorily-granted quasi-Fourth Amendment protections.

When a service provider moves to quash under Section 2703 (d), it

---

[13] The incorporation of New York state law governing the issuance of warrants means that the District Attorney may have needed to seek eavesdropping warrants, which he did not do, before "intercepting or accessing . . . an electronic communication" (CPL 750.05 [1]; see also CPL 250.00 [6]). Prior to obtaining an eavesdropping warrant, the District Attorney would have had to establish "that normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ" (CPL 750.15 [4]). Lower court rulings that eavesdropping warrants are required only for messages in transit (see e.g., Gurevich v Gurevich, 24 Misc 3d 808, 811-813 [Sup Ct, Kings County 2009]) appear to have read the plain meaning of "accessing" out of the statute.  However, Facebook did not raise that defect here, and I note it only in passing.

has initiated a collateral, civil proceeding that gives rise to a final order subject to federal rules of appeal. Even were that not so, the SCA would preempt CPL 450 when an SCA warrant is involved, requiring us to apply the federal rules for interlocutory appeals in this case involving a federal right.[14] But either way, Congress' direction must be honored.

Finally, this appeal is the only opportunity to litigate fully the rights Congress granted to Facebook. The grounds underlying at least one portion of Facebook's motion to quash are specific to Facebook, not its users, and Facebook is before us to

---

[14] At least two other state courts of last resort have found that state courts must follow federal rules when state appellate review is necessary to protect a substantial federal right (Johnson v Fankell, 520 US 911, 914 [1997], collecting McLin v Trimble, 795 P2d 1035 [Oklahoma 1990] [finessing the matter by treating what was brought as an appeal as a reviewable original action, similar to Abrams' "special civil proceeding"] and City of Lakewood v Brace, 919 P2d 231 [Colorado 1996] [applying federal rules in state court]). Although Johnson declined to require a state court of last resort to adhere to federal rules concerning the appealability of orders denying qualified immunity, that decision rested on three factors absent here: (1) the defendants in that case could have their claims fully reviewed after the entry of final judgment, whereas Facebook can have no other day in court; (2) the consequence of applying the state's rules on interlocutory appeals deprived the state -- not the plaintiff -- of an advantage, so that no competition between federal and state interests was at issue (the competing interests in that case involved the state's judgement of how best to balance two state interests, viz. limiting interlocutory appeals and providing state officials with an immediate review of an adverse qualified immunity determination), whereas a federal statutory interest is manifestly present here; and (3) the Supreme Court was justifiably more reluctant to impose federal rules than state courts themselves need to be about importing those rules voluntarily (Johnson, 520 US at 919-920).

defend not only the constitutional rights of its users (where the majority has focused its analysis), but also its own business interests.[15]

Even if those users could realistically seek relief for their own injuries through pretrial suppression hearings or Section 1983 suits -- which the majority believes (majority op. at __), but I dispute (infra at III [c]) -- Facebook will not be a party to those actions and the hypothetical resolution of their claims would not address or remedy Facebook's injuries.  The majority does not suggest an alternative means for the company to vindicate its right to be free of unusually voluminous or unduly burdensome requests.[16]

_____

[15] Even apart from the statutory grant of standing, a simple way to understand why Facebook has standing is to remember that the government cannot search or seize Facebook's business records or property without a warrant.  Facebook has business interests that may be unduly burdened by compliance with the warrants.  Because the injury to those business interests may turn in part on whether the bulk warrants are constitutional, there may be some overlap between arguments that Facebook could make and arguments its users could make.  That overlap, however, does not negate Facebook's own stake in the matter.

[16] The majority does suggest that Facebook could attempt to compel disclosure of the affidavit, pointing to Matter of Newsday (3 NY3d 651 [2004]), a short memorandum in which we suggested an appellant denied the opportunity to appeal an interlocutory order in a criminal proceeding could either bring a Freedom of Information Law request or a civil proceeding pursuant to CPLR article 78.  The majority does not contend an article 78 suit would also have presented Facebook with a viable mechanism for challenging the voluminousness or burden imposed by the warrants.  In fact, Newsday tried to do exactly that -- and, ironically, the Appellate Division converted its article 78 suit into an appeal (id. at 652).

Congress granted service providers their own full day in court, in a completely collateral proceeding subject to normal federal appealability rules. The denial of Facebook's motion to quash cannot be defeated by applying state-court rules of appealability governing garden-variety New York warrants to SCA warrants issued under federal statutory authority.

This Court should be wary of once again deciding that even a neutral state rule regarding the administration of the courts is a valid excuse for refusing to fully entertain a federal cause of action. It was only eight years ago that the Supreme Court reversed us and admonished that "a [state] jurisdictional rule cannot be used as a device to undermine federal law" (Haywood v Drown, 556 US 729, 739 [2009]). Instead, "federal law takes state courts as it finds them only insofar as those courts employ rules that do not 'impose unnecessary burdens upon rights of recovery authorized by federal laws'" (Felder v Casey, 487 US 131, 150 [1988], quoting Brown v Western R. Co. of Alabama, 338 US 294, 298-299 [1949]).

II. Appeal Pursuant to the Common Law

Even if the SCA did not confer a right to appeal (that is, even if New York law governed appealability), Facebook could appeal Supreme Court's order, which is analogous to an order

denying a motion to quash a subpoena in a criminal investigation, under the common law of New York State.[17]

The majority and I agree on the framework used to resolve that issue. As their opinion sets out in more detail, it is a fundamental precept of the jurisdiction of our appellate courts that "'no appeal lies from a determination made in a criminal proceeding unless specifically provided for by statute'" (People v Lovett, 25 NY3d 1088, 1090 [2015], quoting People v Pagan, 19 NY3d 368, 370 [2012]). However, I believe the majority has misconstrued the authority it cites for the proposition that "while a subpoena does not commence a criminal proceeding, the issuance of a warrant does just that."

The majority starts by citing CPL 1.20 [18], which states: "'Criminal proceeding' means any proceeding which (a) constitutes a part of a criminal action or (b) occurs in a criminal court and is related to a prospective, pending or completed criminal action, either of this state or of any other jurisdiction, or involves a criminal investigation." That section does not distinguish between subpoenas and warrants, and therefore does not support the majority's proposition.

---

[17] Had Supreme Court found against the District Attorney, his office would have been entitled to benefit from a symmetrical appeal (see e.g., People v Still, 48 AD2d 366 [1975]). The appellate courts are open equally to the government and the service provider, and there is no reason to think that acknowledging motions to quash SCA warrants are appealable may not benefit the District Attorney in the next case.

The majority next cites <u>Cayuga Indian Nation of N.Y. v Gould</u> (14 NY3d 614 [2010]).  That case squarely contradicts the majority's holding here.  In <u>Cayuga Indian Nation</u>, several district attorneys served warrants on the Nation, concerning possible prosecutions for the unlawful sale of cigarettes.  The next day, the Nation filed a declaratory judgment action contending that the district attorneys "lacked the power to obtain a search warrant or seize property and demanded the return of the confiscated items" (<u>id.</u> at 631).  We recognized that "[t]he general rule is that, once a criminal action has been initiated, a criminal defendant may not bring a declaratory judgment action to raise a statutory interpretation or other issue that can be adjudicated in the criminal prosecution" (<u>id.</u> at 633).  The district attorneys sought to dismiss the declaratory judgment motion, arguing that "under the Criminal Procedure Law, the filing of a search warrant application commences a 'criminal proceeding' (see CPL 1.20 [18] . . . )" (<u>id.</u> at 634).  We rejected the district attorneys' argument, and allowed the Nation to proceed, holding the following, which directly contradicts the majority's position here:

> "Our holding in <u>Kelly's Rental</u> did not expand
> the rule precluding the use of declaratory
> judgment actions to encompass situations like
> this one where a search warrant application
> was executed but no party was named as the
> defendant and no accusatory instrument had
> been filed against any person or company at
> the time civil relief was sought. A search
> warrant often targets a place without

identifying a defendant. As such, it is not accurate to say that, in every case where a search warrant application has been filed, a criminal prosecution has been commenced, particularly since a warrant may be requested long before a decision is made to file criminal charges. A party is not categorically precluded from initiating a declaratory judgment action based on nothing more than the execution of a search warrant when the issue to be raised involves a pure question of law -- such as a query concerning the scope and interpretation of a statute or a challenge to its constitutional validity -- and the facts relevant to that issue are undisputed, as they are here. Because no criminal action had been initiated against any identified party at the time this declaratory judgment action was commenced, the decision whether the action could be entertained fell soundly within the realm of discretion possessed by the lower courts and we discern no abuse of that discretion in the denial of the motion to dismiss."

(id. at 634-635)

The majority finally relies on Matter of B.T. Prods. v Barr (54 AD2d 315, 319 [4th Dept 1976], affd 44 NY2d 226 [1978]). There, pursuant to a warrant, the Organized Crime Task Force seized all of B.T. Products' records for a two-year period. B.T. Products sought a writ of prohibition, contending that the Task Force lacked the authority to do so. We affirmed B.T. Products' right to proceed with its writ of prohibition, writing:

"In most cases, prohibition will not be available to challenge the validity of a search warrant. For one thing, it will lie only if the challenge, as in the present case, goes to jurisdiction rather than simply to the existence of probable cause in a particular situation. Of equal significance is the fact that in the typical case there

> will exist an adequate alternative remedy. A
> search warrant is most often used to obtain
> evidence in the course of a criminal
> investigation of a particular crime, an
> investigation which will soon eventuate in a
> criminal proceeding. In such cases, the
> validity of the search warrant will of course
> be subject to challenge by means of a motion
> to suppress, the denial of which is
> appealable in the context of an appeal from
> the resultant conviction. Here, however,
> there is no prosecution, and there is no
> indication that there ever will be a
> prosecution, and thus there is no opportunity
> for a motion to suppress. To allow the
> failure to prosecute, a failure which may
> well be due to the absence of sufficient
> grounds to prosecute, to serve as a shield
> for the allegedly illegal seizure and
> retention of private property by government
> agents would be to make a mockery of justice.
> This is indeed a proper case for application
> of the just and ancient writ of prohibition."

(id. at 233)

Far from supporting the proposition that the issuance of a

warrant always commences a criminal proceeding, whereas the

issuance of a subpoena does not, the majority's precedents

establish three propositions contrary to its holding today: (1)

the issuance of a warrant does not always bar the warrant's

target from commencing a collateral proceeding to attack it; (2)

so long as "no criminal action had been initiated against any

identified party," challenges to the warrant need not be

restricted to the forthcoming criminal prosecution; and (3) when

the target of the warrant is not the target of the potential

prosecution, that person will "have no adequate alternative

remedy" other than a collateral challenge to the warrant, which

cuts sharply in favor of entertaining the challenge to the warrant.

Because the majority has interpreted our precedents to state an inflexible rule that does not, until now, exist, it should hardly be surprising that a "formidable line of authority" allows the direct appeal of orders granting or denying motions to quash subpoenas, even those issued in criminal investigations if prior to the commencement of a criminal action (Matter of Cunningham v Nadjari, 39 NY2d 314, 317 [1976]).  Such motions, we have reasoned, are not made in a criminal proceeding.  Rather, they are final orders in special proceedings on the civil side of a court vested with civil jurisdiction (id.).

Those precedents are indistinguishable from Facebook's situation, unless one woodenly applies "warrant" and "subpoena." For example, in Matter of Abrams (62 NY2d 183 [1984]), we held that recipients of subpoenas issued by the Attorney General, in furtherance of a criminal ticket-scalping investigation, could move to quash the subpoenas, which decision was appealable, even though the employees themselves (unlike Facebook here) were the targets of the investigation.  In Matter of Boikess v Aspland (24 NY2d 136 [1969]) we entertained the appeal of motions to quash subpoenas issued as part of a criminal investigation of marijuana use by Stony Brook professors.  Again, the subpoena targets were themselves the potential criminal defendants, which is not the case here.

In determining whether proceedings should be properly characterized as civil or criminal, this Court has eschewed a label-based test and instead consistently adhered to looking "to the true nature of the proceeding and to the relief sought" (Abrams, 62 NY2d at 191).[18]  The majority applies this test and concludes that the SCA bulk warrants operate more like traditional search warrants than like the subpoenas at issue in People v Doe (272 NY 453 [1936]) and its progeny.  Here, the majority and I part ways.

The SCA warrants operate more like subpoenas than like traditional search warrants in several significant, and determinative, respects.[19]  First, rather than permitting state

_____

[18] Abrams does not require a proceeding to be closely analogous to a motion to quash a subpoena to inaugurate a special civil proceeding incident to, but separate from, a criminal one. In fact, Abrams itself extended not only to a motion to quash a subpoena, but also to a motion to disqualify an attorney. The proper analysis, then, should focus on the true nature of the proceedings (here, essentially, a disclosure request served on an innocent third party), and not on whether the SCA bulk warrants operate more like traditional search warrants or subpoenas. Nevertheless, because the bulk warrants do operate more like subpoenas, I leave that issue for another day.

[19] The delegates to the 1938 Constitutional Convention themselves thought the term "warrants" poorly characterized the type of order that should be required to seize electronic communications. As one of the leading proponents of what became the relevant sentence of article I, § 12 noted, "The proposal of Senator Dunnigan uses the words, 'ex parte orders.' I believe such terminology is better, I think it fits more effectively the work of district attorneys; I think a warrant implies some kind of service on a person, and to use the words 'ex parte orders' makes it clear that it can be obtained from a court and it can be kept secret" (Revised Record at 471). Although Section 12 as ultimately drafted requires "ex parte orders or warrants" as the

actors to seize property or private information directly, as traditional warrants do, the SCA warrants compel a third party (Facebook) to expend resources producing documents for an investigation. Second, unlike traditional warrants, service providers are not the targets of, or in any way involved in, the underlying investigation but are instead the neutral repositories of electronic information. Third, service providers must preserve information pending the resolution of a motion to quash (§ 2703 [f]). As a result, SCA warrants can be challenged before compliance, and the results of that challenge can be appealed, without tipping off the subjects of the investigation or otherwise compromising the state's interest in the preservation of evidence. Fourth, our legal system is based on the adversarial process. Ex parte proceedings are a sharp departure from the norm, permissible only when required by exigent circumstances. Such circumstances, often present in the case of traditional warrants, are absent here. The District Attorney, who argued at Supreme Court that the notice provisions governing traditional search warrants under CPL 690.50 did not apply to SCA warrants because of the unusual manner in which those warrants were issued and executed, recognized that the 381 orders at issue here operated more like subpoenas than warrants in some

---

seemingly inadvertent result of a broader, and rushed, compromise between the doughty Senator Dunnigan and his chief Republican adversary, even that final language supports the conclusion that the delegates, too, considered the 1938 precursor of the SCA warrant to be a hybrid.

respects.[20]  Indeed, the fact that parallel provisions of the SCA contemplate allowing the government to subpoena, without notice to Facebook's customers, nearly all of the material it requested is fatal to the District Attorney's effort to distinguish the true nature of the two types of order (§ 2703 [b] [1] [B] [i]; § 2705; see Microsoft, 829 F3d at 227 [2d Cir 2016] [Lynch, J., concurring].

The execution of SCA warrants so closely resembles the execution of traditional subpoenas and civil document requests that no other aspects need to be considered.[21]  Nevertheless, the prior cases and the parties suggest several other factors that bear on an Abrams-like inquiry into whether the underlying proceeding is more criminal than civil in nature.  Those factors also tend to support the conclusion that Facebook has a right to appeal.

Abrams itself focused on whether the contested motion could arise in the context of a purely civil suit and on whetherrelief sought had anything inherently to do with criminal substantive or

---

[20] The majority asserts that "SCA warrants are governed by the same substantive and procedural laws as traditional search warrants", but cites CPL 690 and 700, and People v Tambe (71 NY2d 492 [1988]) -- all of which concern wiretapping warrants, not SCA warrants.

[21] The majority's contention that "SCA warrants are governed by the same substantive and procedural laws as traditional search warrants" (majority op at __) conflates the manner of their issuance with the manner of their execution and ignores the fact at the heart of this case: SCA warrants differ from their traditional counterparts in significant part because Congress declared their recipients could move to quash or modify the orders.

procedural law (as well as on the uncertainty that criminal charges would ever be filed against particular respondents, discussed infra at n 22) (Abrams at 193-194). Because the SCA warrants are substantively identical to subpoenas, and because motions to quash subpoenas arise and are relieved in civil suits, Facebook satisfies Abrams' test. Although the relief Facebook seeks may include a review of a court's determination of probable cause, that review is not inherent in its motion to quash, which a court could grant because of a determination that the warrants injured Facebook's business interests in a manner that had nothing to do with criminal substantive or procedural law. Indeed, the issue properly before us on appeal is whether Facebook can appeal a determination that it lacked standing to move to quash the warrants. That jurisdictional determination has nothing to do with the criminal law and can be appealed and settled without reviewing issues of probable cause, causing substantial delay, or giving rise to interminable interlocutory appeals.

Thecontention that an SCA warrant is not "civil by nature" because it commences a criminal proceeding under CPL 1.20 (18) and can be issued only to a governmental entity upon a showing of probable cause misses the point. The question is not whether the warrant itself was issued in a criminal proceeding, but whether the motion to quash gave rise -- as so often under Doe and its progeny -- to a civil proceeding, with its own index number,

collateral to and discrete from the criminal one that birthed it. That is precisely what happened here.

The District Attorney's argument that the text of the statute refers to Section 2703 (a) orders as warrants, and that the Second Circuit has found Congress intended them to be treated as warrants, is also unpersuasive. Although the Second Circuit is not required to adopt Abrams' anti-textualist approach, our longstanding practice requires we abjure simple heuristics and instead determine the true nature of the proceeding. Furthermore, the nature of the SCA bulk warrants was a close question for that court (see Matter of Warrant to Search a Certain E-Mail Account Controlled and Maintained by Microsoft Corporation, --- F3d ---, ----- [2d Cir 2017] [Jacobs, J., dissenting]; id. at ----- [Cabranes, J., dissenting]; id. at ---- [Raggi, J., dissenting]; id. at ----- [Droney, J., dissenting]; see also In re Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp. [15 F Supp 3d at 471] [calling the order "a hybrid: part search warrant and part subpoena"]), and Judge Carney's majority opinion turned in significant part on her finding that the SCA's primary emphasis was on protecting user content (Microsoft, 829 F3d at 201, 205-206, 217-219, 222; Microsoft, --- F3d at ---). In Microsoft, the statute's purpose was served by finding Section 2703 (a) orders were issued like warrants for the purposes of extraterritorial

application; here, it is served by recognized those orders are executed like subpoenas for the purposes of motions to quash.

An unstated common practice behind our precedents supports Facebook's right to appeal.  Although our series of short memoranda affirming or denying leave to appeal have not offered explicit and extensive guidance on how to determine whether an underlying proceeding is more criminal or civil in nature, a line of Appellate Division cases invoked by Facebook suggests the pivotal consideration is whether "the denial of an appeal . . . at this juncture would irrevocably preclude [a party] from any opportunity to vindicate its position before an appellate body" (People v Marin, 86 AD2d 40, 42 [3d Dept 1982]).  Those cases create a dichotomy between (a) appeals where "either of the immediate parties to an underlying criminal action" can continue to contest "the propriety of an order on the direct appeal from any resulting judgment of conviction" and (b) appeals by innocent third parties who would have no other day in court (id.).  A survey of the cases resolved by this Court suggests the rule ascribed to us by the Appellate Division not only squares with traditional notions of justice but also has considerable predictive power.[22]  Because Facebook is here to protect its own

_____

[22] See e.g., Matter of Di Brizzi (303 NY 206 [1953] [individual could appeal the denial of a motion to quash a subpoena ordering he testify before the governor's crime commission, a body without the power to charge or try defendants]); Matter of Hynes v Karassik (47 NY2d 659 [1979] [respondent previously acquitted in a criminal trial could appeal an order unsealing the records of that case]); Matter of Codey

rights, not only the rights of its users, and because no one
contends it will have any other opportunity to assert its own
rights on appeal, it should be able under the New York common law

_____

(82 NY2d 521 [1993] [reporter subject to a State of New Jersey
subpoena to reveal confidential sources, who presence was
demanded by New Jersey pursuant to CPL 640.10 (2), could appeal
the CPL 640 determination]); People v Santangello (38 NY2d 536
[1976] [petitioner who had allegedly participated in the bribery
of police officers could not appeal the denial of an order
directing the prosecutor to admit the petitioner was the subject
of electronic surveillance]); Matter of Alphonso C. (38 NY2d 923
1976 [1976] [respondent who owned the car used in an attempted
homicide could not appeal an order directing him to appear in a
police line-up; separate appellant suspected of grand larceny
could not appeal an order directing him provide a handwriting
sample]); Bernstein v New York County District Attorney (67 NY2d
852 [1985] [petitioner could not appeal the disclosure of notices
of tax deficiency to prosecutors]).  Indeed, the only exceptions
appear to be Abrams itself (allowing witnesses who might someday
be charged with the illegal sale and distribution of tickets to
large events) and Boikess (allowing university professors
suspected of smoking pot with their students to move to quash).
The aberration in Abrams can be explained by the Court's
suspicions that the investigation may result "in no criminal
charges or criminal complaints being filed at all" (Abrams at
193).  In either case, both Abrams and Boikess depart from the
Appellate Division's taxonomy to allow an appeal Marin might have
foreclosed.
    Cases in which an appeal was dismissed from a proceeding
arising in a court with limited and exclusively criminal
jurisdiction (see e.g., Matter of Ryan [Hogan], 306 NY 11 [1961]
[dismissing appeal from order of Court of General Sessions of
County of New York]) or that resulted from an innocent third
party's effort to intervene in an ongoing investigation (see
Newsday, 3 NY3d 651) are outside the scope of Marin and
inapposite to the issue at hand.  The Supreme Court possesses
civil and criminal jurisdiction (Abrams, 62 NY 2d at 191), and,
contrary to the government's assertion, Facebook is not seeking
to involve itself in a criminal process.  Instead, we are here
because its involvement has been compelled by the District
Attorney.

to present the case for its motion to quash before the Appellate Division -- and, if necessary, before this Court.

If it cannot, there will be no opportunity for the Appellate Division or this Court to harmonize the decisions of our trial courts with one another, with our interpretation of the law, or with the requirements of the SCA -- forcing the federal due process and New York constitutional issues on the Court.

## III.  Standing under the SCA and the Common Law

Because Facebook is entitled to appeal Supreme Court's denial of its motion to quash under the SCA and New York common law, the issues of its standing to challenge the bulk warrants and of the propriety of the SCA warrants themselves were properly before the Appellate Division.  Because the former issue is a question of law adequately briefed by both parties, I conclude that Facebook has standing to assert its own rights under the SCA, its own rights under the common law, and the rights of its users under the traditional test for third-party standing.

I would remit the case to the Appellate Division to evaluate the merits of Facebook's motion to quash, and neither have nor should have any view on the merits determination.

a.  SCA Standing

Section 2703 (d) grants service providers a right to move to quash or modify warrants (supra, Part I).  Thus, to determine standing, a plaintiff need only allege that it is a "service provider" as defined by the statute.  No one disputes that Facebook is a service provider.  Therefore, the statute itself establishes Facebook's standing to file a motion to quash, in which it can argue the warrants are unusually voluminous and/or unduly burdensome.[23]

b.  Common Law Standing

Even if Section 2703 (d) did not exist, or it was interpreted to extend to subpoenas only and not warrants, Facebook laid out a prima facie case that compliance with the court order would injure it. That injury establishes standing.

The most straightforward injury is the administrative cost of gathering the required information. Facebook and the amici supporting its position advance this interpretation, and

---

[23] As to the question of whether Facebook argued that the warrants were too voluminous and too burdensome, Facebook argued in Supreme Court that "this set of warrants exceeds by more than tenfold the largest number of warrants we ever received in a single investigation," informed this Court that it "was forced to conduct a burdensome search of hundreds of its users' accounts," and has asserted an independent business and financial interest in ensuring that its users' privacy rights are respected.

Facebook's briefs here and in the Appellate Division state that the company was forced to conduct a burdensome search and seizure of an extensive number of accounts.  Facebook has consistently criticized the volume of information demanded by these warrants. For instance, Facebook, which receives and complies with tens of thousands of law enforcement requests each year, informed Supreme Court that this set of 381 warrants exceeded by more than tenfold the largest number of warrants the company had ever received in a single investigation. Each warrant also requested a considerable volume of information, from an extensive number of places around the site, and unbounded by time or type of content.  Whether that administrative cost is sufficiently great to require some or all of the warrants be quashed or modified is not the relevant question; the existence of even slight injury suffices to create standing.

Furthermore, as Facebook and amici also maintain, the direct administrative costs of compliance are not the only potential injuries at play here. Facebook argued in Supreme Court that aiding the government in trampling the Fourth Amendment rights of its users would be a breach of the legal obligations embodied in its terms of service and data use policy.  Here, Facebook also maintained that ignoring its users' constitutional right to

privacy would severely damage its ability to maintain and broaden its user base.[24]

Because Facebook's participation in delivering unbounded information concerning 381 of its users -- as well as information concerning what amounts to thousands if not tens of thousands of those users' friends and fellow enthusiasts -- could have an adverse impact on Facebook's own business operations, Facebook has articulated a sufficient injury to itself to establish standing, quite apart from Section 2703 (d).

c. Third-Party Standing

In addition to asserting its own rights, Facebook is here entitled to assert the Fourth Amendment rights of its users under the traditional test for third-party standing.

Indeed, the District Attorney barely contests Facebook's satisfaction of that test.

Instead, the District Attorney has confused the two very different questions of (1) whether and how far the exclusionary rule extends to third parties who were not the subject of an unlawful search and seizure; and (2) when does a litigant, who is in some degree of privity with a third party and better placed to stand in the shoes of that party for the purposes of vindicating

---

[24] The costs associated with this litigation illustrate how seriously Facebook takes this threat to its financial well-being.

that party's rights, have standing to assert the rights of that third party?  The first question is the focus of the District Attorney's argument concerning Facebook's standing, but is not relevant here.  The exclusionary rule is a judge-made doctrine, designed to provide a sufficient deterrent to unlawful searches and seizures.  The extent of its sweep is determined by policy judgments about how broadly (or narrowly) the rule must extend to provide a sufficient deterrent while not excessively barring the use of probative evidence.  Those concerns are not at play here. In contrast, the traditional test for determining third-party standing asks whether, because an aggrieved party is poorly situated to protect his or her own rights, there is another party better situated and properly motivated to do so.  Facebook is correct to apply the traditional test.

Under that test, the federal courts recognize the right of litigants to bring actions on behalf of third parties, provided the litigant: (a) has suffered an injury in fact sufficient to inspire concrete interest in the outcome of the case; (b) has a close relation to those third parties; and (c) is free of some hindrance obstructing the third parties' ability to protect their own interests (Powers v Ohio, 499 US 400, 410-411 [1991]).

We have not articulated a version of that test specific to New York State. The Appellate Division, writing without the benefit of Powers in People v Kern (149 AD2d 187, 233 [1989]), articulated and adopted what it then understood to be the federal

standard. Rather than follow the Appellate Division's outdated interpretation of federal practice, I apply the three-part Powers test.

No one questions that Facebook satisfies two of Powers' three criteria.[25]

Thus, whether Facebook may assert the rights of its users turns on the degree to which its users would be able to protect their own Fourth Amendment rights.  The District Attorney argues, and the majority agrees, that those users can vindicate their rights through pretrial suppression hearings or civil remedies. Neither I, nor -- much more importantly -- the delegates to the 1938 constitutional convention agree.

Few users will be afforded the opportunity to invoke an exclusionary remedy to the alleged Fourth Amendment violation. We now know that, of the 381 users whose accounts were seized, only 62 were ever charged. Most, perhaps all, of those 62 pleaded guilty and were sentenced to probation, community service, or conditional discharge. Not one of them moved to suppress evidence seized through the SCA warrants.  As we have written, "to allow the failure to prosecute . . . to serve as a shield for the allegedly illegal seizure and retention of private property by

_____

[25] Facebook's conscription by the District Attorney's office and the threats to its business state injuries in fact. Its business relationship with its users, with whom it has an agreement as to the terms of service, and by whose defection its business would be threatened, is as substantial a relationship as those accepted by the courts in several landmark third-party standing cases (see e.g., Craig v Boren, 429 US 190 [1976]).

government agents would be to make a mockery of justice" (B.T.
Prods., 44 NY2d at 233).

The case at bar is even worse than contemplated in B.T.
Prods. Although some of the 319 users whose accounts were seized
but who were never charged no doubt owe their relief to
prosecutorial discretion, a number of the users -- such as the
high school students -- could not themselves have been suspected
of engaging in disabilities fraud and could thus never have had
an opportunity to challenge the seizures in a criminal court.

It is wholly unrealistic to suggest that those high school
students and other persons targeted by the dragnet, not because
they were suspected of disability fraud but because they knew
someone who was, should vindicate their rights by filing civil
suits against the government under Section 2707 or 42 USC § 1983.
The delegates to the 1938 constitutional convention, who debated
the practicalities of civil suits at some length, were adamant
that this suggestion "may appeal to a jurist cloistered in his
chambers, but let the average citizen try it!" (Revised Record at
362).  The delegates recognized that "the excuse of the officer's
zeal in the performance of what he would describe as a public
duty" (id.) and the expense of challenging a defendant with the
"financial resources of the city back of him" (id. at 459) would
make "these remedies in any concrete instance . . . ineffective"
(id. at 529) and so impractical as to be "unreal" (id. at 519) or

"absurd" (id. at 364).[26]  The prospect of civil suits to vindicate unlawful searches and seizures was offered as a reason against adding article 1, § 12, to the New York Constitution. Roundly rejecting that position, the delegates, and later the People, adopted not just the language of the Fourth Amendment verbatim, but added to it the language specifically sanctifying electronic communications transmitted via a third party.  Even stipulating that each user would, despite the initial indefinite gag order, be told at some point of the seizure, the mere formal

---

[26] They also had a good deal to say against the idea that the proponents of the Magna Carta and the Declaration of Independence could possibly have contemplated what we would now recognize as a liability rule for Fourth Amendment violations. "Do you suppose, for example, that the barons at Runnymede, when they insisted on their rights from King John, were asking for the right to sue King John's police officer? . . . Do you suppose that they had any idea at all, when the asked to have this written into the Magna Charta, that what they were actually asking for was the right to go to King John after he had violated it and say, 'Now, King John, won't you remove this officer?' Why, of course they didn't. You know they didn't. There is not a man or woman in this room that believes that when the American colonists back in 1776 were putting up the fight for freedom and for liberty, when they drew up their Constitution and they put these things in, that they had any such idea in mind. Do you think the men who fought at Bunker Hill, do you think the men who walked in the snow with bloody feet at Valley Forge, do you think that the men that fought over here at Ticonderoga, were fighting for the right to resist the police officers of King George? Do you think they were fighting for the right to sue a police officer of King George, or do you think they were fighting for the right to resist an unreasonable search and seizure on the part of King George's henchmen? You know they were not. You know that when they wrote that into the Bill of Rights of the Federal Constitution they thought those were living words, not a mere empty skeleton without any meat or flesh or blood upon it." (Revised Record at 460)

possibility of a civil suit does not foreclose Facebook from asserting third-party standing as the litigant best placed to vindicate its users' rights in practice, before a violation of any rights has occurred, by way of the adversarial system on which our rule of law rests.

IV.  Conclusion

Under the majority's decision, this Court is powerless to protect the business interests of a major company; return information seized from either the 381 individuals, many of whom were never suspected of wrongdoing, or the thousands of innocent individuals who communicated or simply happened to share an interest with a user named in the bulk warrants; prevent a patchwork of opposing jurisprudence on an emerging federal and constitutional issue from creeping across the state; and vindicate the rights granted to New Yorkers in article I, § 12. Although seizing social media content to help curtail widespread disabilities fraud may seem to some a good bargain, the delegates of 1938, with their eyes trained on the gathering storm across the Atlantic (or, in the case of many Republican representatives, on the New Dealer in the White House), remind us that

> "the time may come not when some district
> attorney will have trouble in convicting
> someone, not when the rights of some crook
> ought to be forgotten and he ought to be in
> jail, not when a crook may or may not get

convicted, but the time may come in this State when times will become political, and you will be a convict in the eyes of the other fellow if you don't believe in his political philosophy.  If there is any excuse for a written constitution, if there has ever been any excuse for a written constitution, it is to write in there the protection for the minority against the aggression and the greed and the brute force of the majority."

(Revised Record at 465)

The concern of this case, like the concern of the delegates' generation, is not with crime waves, but with the protection of the individual against the power of the government.

"The issue," in the language of 1938,

"is both clear and simple. It is one of honesty, plain and simple. Shall we say what we mean, and shall we mean what we say? Shall we prohibit wiretapping in one breath and admit the evidence obtained in violation of the principle in the other breath? Do the gentlemen of the opposition subscribe to the principle that we should adopt a constitutional amendment here with all the sacrosanctness that that imports, and then say to the enforcement officials, 'You may disregard it, you may violate it, you may override it, you may flout it, if you please, and we will not only uphold you, but the State will adopt the fruits of your crime?' If that is their position then God help us. I know of no better invitation to political tyranny or official lawlessness. This kind of logic . . . may be properly described in the words of one of our distinguished statesmen as either crack-pot or baloney. If this is their position, then we say to them now that they are creating a despotism clothed in the robes of legal sanction, nothing more, nothing less."

(Revised Record at 504-5)

Constitutional and Congressional words of promise were given to our ear, and I would not break them to our hope. I respectfully dissent, and would remand this case to the Appellate Division to resolve the motion to quash or modify the warrants, as well as the pendant matters involving the permissibility of an indefinite gag order and the disclosure of the underlying affidavit. As one of the delegates to the 1938 convention urged his fellow representatives, "let us decide this thing on the merits" (Revised Record at 462).

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed, without costs.  Opinion by Judge Stein.  Chief Judge DiFiore and Judges Abdus-Salaam and Fahey concur.  Judge Rivera concurs in result in a separate concurring opinion.  Judge Wilson dissents in an opinion.  Judge Garcia took no part.

Decided April 4, 2017